David J. WILSON, Petitioner–Appellant,

v.

Gary McCAUGHTRY, Respondent–Appellee.

No. 90–1017.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1992.

Decided May 20, 1993.

Alan Raphael, Christina Giorgio (argued), Loyola University School of Law, Chicago, IL, for petitioner-appellant.

Donald J. Hanaway, Atty. Gen., Daniel J. O'Brien (argued), Jerome S. Schmidt, Asst. Attys. Gen., Wisconsin Dept. of Justice, Madison, WI, for respondent-appellee.

Before CUMMINGS, COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

David James Wilson filed a petition in the district court for a writ of habeas corpus challenging his conviction in a Wisconsin state trial court for second-degree murder, subsequently affirmed by the Wisconsin Supreme Court. 28 U.S.C. § 2254. Wilson alleged that his conviction was obtained in violation of the United States Constitution because the state prosecutor waited sixteen years after the murder before indicting him

and because the state trial court failed to instruct the jury on the lesser included offense of reckless homicide. We agree with the district court that neither argument presents grounds for habeas relief, and affirm the court's denial of Wilson's petition.

## I.

### A. Factual Background

Title 28, U.S.C. § 2254(d) provides that factual findings of a state court are presumed to be proper in a federal habeas corpus proceeding, if the findings are made after a hearing on the merits, and are fairly supported by the record. "This presumption applies to the factual findings of state appeal courts as well as state trial courts." *Lewis v. Huch*, 964 F.2d 670, 671 (7th Cir.1992). Accordingly, the following statement of facts is drawn from *State v. Wilson*, 149 Wis.2d 878, 440 N.W.2d 534 (1989), the Wisconsin Supreme Court opinion upholding Wilson's conviction.

On January 8, 1969, Donald John Miller, Wilson's four-year-old stepson, died at a hospital in Kenosha, Wisconsin, after emergency surgery for a ruptured stomach the night before. The Kenosha County coroner, Dr. Harold Wagner, performed an autopsy on the boy's body and determined that the cause of death was "shock and peritonitis following rupture of the stomach due to undetermined trauma."[1] Dr. Wagner noted that there was no apparent preexisting pathology to account for the ruptured stomach or the peritonitis. He also reported finding five healing rib fractures with callous formations[2] on both sides of Donald's rib cage, all approximately the same age, and a "blister-like lesion" on Donald's right hand. Dr. Wagner reported that Donald had fallen several times during the preceding few weeks and concluded that these falls could have caused the rib fractures and the stomach laceration, but cautioned that the evidence available to him was inconclusive since "[i]n the absence of a specific incident of force or trauma and without a lesion on the skin, we cannot relate any of the falls directly to the above findings."[3]

Kenosha County Deputy Sheriff Robert Hubbard interviewed the petitioner Wilson on January 8 and 12, 1969. Wilson told Hubbard that on the morning of January 7, 1969, Donald complained of a headache and stayed home from school. Only Wilson remained at home with the boy from the time his wife (the boy's mother) left in the morning until she returned at approximately 4:00 p.m. Wilson claimed that he worked outside on a car during the morning and periodically checked on Donald, who remained in bed until lunchtime. At about noon, Wilson prepared and served Donald a lunch of chicken soup. Wilson told Hubbard that Donald's only physical complaint was that he was cold.

During their investigation of the suspicious circumstances surrounding Donald's death, deputies from the Kenosha County Sheriff's department also interviewed Donald's mother, four sisters, teacher, and a neighbor, and also reviewed Donald's medical records. Lacking what they determined at the time to be solid evidence of criminal conduct, the authorities terminated their investigation. The case was briefly reopened in March, 1973, when, following an arrest of Wilson for sexual intercourse with a minor, Donald's sisters advised the police that Wilson physically abused Donald. Dr. Wagner, the Kenosha coroner, was reinterviewed at the time, but once again stated he could not link any known conduct to Donald's fatal injuries. The investigation was closed a second time.

In 1985, David Cole, a news director for Kenosha radio station WLIP, submitted a report to the Kenosha district attorney on his investigation of Donald's death. Cole had consulted with Dr. Robert W. Huntington III, a highly respected forensic pathologist at

---

1. Peritonitis is the inflammation of the peritoneum, the membrane that lines the cavity of the abdomen.

2. According to the testimony of Donald's doctor, Morris Siegel, it takes about six weeks for callouses to form on a fracture site after it has healed.

3. The record fails to reflect where Dr. Wagner received the information that Donald had allegedly fallen several times in the last few weeks of his life.

the University of Wisconsin Medical School, Madison, Wisconsin, who stated that, based on the information available to him, he was 95% certain that the infant Donald died from child abuse. Dr. Huntington is Board certified in the areas of anatomic and clinical pathology, and in the sub-specialty of forensic pathology. He testified at trial that he had performed in excess of 1,500 post-mortem examinations. Prompted by Cole's report, the case was reopened in June 1985. On August 23, 1985, Wilson was charged with second-degree murder in connection with Donald's death. Wis.Stat.Ann. § 940.02 (West 1982). During Wilson's trial, Dr. Morris Siegel, Donald's doctor, testified that in the late afternoon of January 7, 1969, Donald's mother brought the infant child to his office. According to Dr. Siegel, Donald was in a "moribund" state and had a distended abdomen. Dr. Siegel testified that the boy was "very, very poorly responsive with a very poor pulse and his color was very palid [sic] and pupils were dilated. The child was hardly responsive, very short of breath, with a pulse rate of very markedly increased rate." Fearing that the boy was near death, Dr. Siegel immediately transported him to the hospital. X-rays revealed the possibility of a ruptured internal organ and peritonitis, as well as what Dr. Siegel described as five healed rib fractures previously unknown. Dr. Siegel concluded that Donald was suffering from a ruptured internal organ and peritonitis and assisted in emergency surgery performed late that same evening. During surgery, doctors discovered a three-centimeter stomach tear and 1200 centimeters of yellow, murky fluid containing food particles in the boy's stomach. Donald died the following day. Dr. Siegel testified that the stomach laceration was caused by a blunt abdominal blow, such as a punch or kick, probably delivered shortly after Donald ingested the chicken soup since an empty stomach usually will not tear. Dr. Siegel concluded that the fatal blow must have occurred sometime during the afternoon of January 7, 1969, just hours before Donald's mother brought him to the doctor. It is undisputed that during this period of time Donald was in the exclusive care, control and custody of the petitioner.

Dr. Siegel also testified that Donald had been admitted to the hospital on two previous occasions, once for anemia and once for a tonsillectomy. Dr. Siegel reported that Donald had been treated in the hospital emergency room for cuts and scrapes on a few other occasions. The doctor further reported that on December 21, 1968, Donald was treated for an injury described by his mother as bruised testicles which she stated resulted from a fall at school.

Dr. Huntington, the University of Wisconsin medical school forensic pathologist, testified that after reviewing Dr. Wagner's autopsy report, the surgery report, as well as the police reports, he concluded "to a reasonable degree of medical certainty" that Donald was a victim of one of the tragedies of our time: what we now know as child abuse. Dr. Huntington cited in support of his conclusion the five healing rib fractures for which no cause was offered, burns on Donald's fingers, and the stomach rupture. He concluded that Donald's fatal injury was the result of a concentrated high-energy blow to the abdomen, such as a punch or kick. Dr. Huntington explained that a stomach tear allows the contents of the stomach to spill into the peritoneal cavity causing peritonitis, which is fatal within hours if not treated. He testified that consumption of a large quantity of liquid makes the stomach more susceptible to a rupture and that, in this case, Donald was struck in the stomach after eating soup for lunch. Dr. Huntington ruled out accidental causes, such as a fall, for the injury because the force required to cause the type of stomach tear Donald suffered would be similar to falling from a second-story window onto an object that would concentrate the force of the impact or similar to the amount of force sustained in a motor vehicle accident. The record contains no evidence, nor does petitioner contend, that Donald was involved in any such accident.

Dr. Mary E.S. Case, an associate professor of pathology at St. Louis University who is Board certified in anatomical pathology, neuropathology, and forensic pathology, also testified for the state. Dr. Case agreed with Dr. Huntington's conclusions about the cause of Donald's injury. Dr. Case agreed with

Dr. Huntington that stomach tears are not caused by ordinary falls a toddler might take around the house, but can result from significant falls, such as from a second- or third-story window, or from a tree onto a picket fence. Dr. Case also stated that car accidents, which produce force similar to a punch or kick, can cause stomach tears. Based on Donald's numerous unexplained or insufficiently explained injuries (the abrasions, burns, five rib injuries, bruised testicles, and the stomach tear), she concluded that Donald was a victim of what we now classify as battered-child syndrome. Dr. Case also testified that there was no object in the typical home capable of accidentally producing a fatal stomach tear.

Susan Antrim, Donald's sister, testified that Wilson frequently abused Donald. She testified that Donald was "very scared" of Wilson and "always became very quiet when [Wilson] come (sic) into a room" but that when Wilson was absent Donald "was his old happy self again." She remembered that on January 6, 1969, the day before Donald suffered his fatal injury, the following incident occurred:

"Mr. Wilson told Donnie to go into the bathroom and Donnie kind of whimpered and went into the bathroom and you could hear scuffling noises. And we had a stand-up hamper, and you could hear it hitting against the wall and water running and my little brother crying, and then he'd whimper a little bit, and after a little while they came out. And Donnie walked past where I was standing with his eyes to the floor and he got in front of the space heater and he vomited up something clear, and Mr. Wilson told him that he would have to drink more water, and Donnie kind of whimpered a little bit, and Mr. Wilson kicked Donnie [between the hip bone and the rib cage]. And he went to the kitchen sink, Mr. Wilson did, and got Donnie a glass of water which Donnie drank. And then Mr. Wilson told him, now smile. And Donnie smiled and he looked at us and he went in his room."

Antrim added that the water Wilson gave Donald had steam rising from it. Antrim also testified that Wilson kicked Donald whenever the four-year-old "did something that angered" him. She estimated that this occurred a "couple times a week". Antrim stated that Wilson would take Donald into the bathroom for similar treatment "almost each time" her mother, Darlene Wilson, left their home. Antrim, who was but nine years of age at the time of Donald's death, explained that she never told her mother about Wilson's abuse of Donald because the petitioner told her "that if we ever told our mother what was going on, we would get the same thing Donnie was getting." Another of Donald's sisters, Joan Flatley, who was four-years-old when her brother died, testified that shortly before Donald's death, she observed Wilson slam a toilet seat on Donald's testicles. Both Antrim and Flatley were interviewed by police shortly after their brother's death, but Flatley testified that they had already been warned by Wilson that he would harm them if they told anyone what they had seen. Flatley recalled that Wilson warned her that she would be "sleeping with [Donald]" if she gave information to the police.

Nancy Gustke, Donald's Head Start teacher, testified that shortly before Donald's death, she noticed a suspicious mark on Donald's back, which she described as "a circular burn type injury". Gustke notified her principal, and planned to make a home visit to discuss her observations, but Donald suffered the fatal injury before she had an opportunity to carry out her intentions. According to Gustke, Donald had not been injured at school. Two of Donald's former neighbors and baby sitters, May Ann Wade and Marie Hughes, testified that Donald was healthy and normal prior to his death. Hughes did testify, however, that Donald had become withdrawn and frightened after Wilson moved into the household.

Dr. Chesley Erwin, the defense pathologist, stated that he could not make the same findings, to a reasonable degree of medical certainty, that Dr. Huntington and Dr. Case had made about Donald's death. Erwin did concede that injuries from a severe blow to the abdominal area such as Donald's were more likely to occur after the ingestion of a liquid and as a result of "appreciable energy" inflicted upon a filled stomach, consistent with a punch or a kick. However, Erwin

insisted that Donald could have sustained his injuries from an accidental fall in his home. Wilson himself offered no explanation for Donald's injuries, and merely denied killing the child.

### B. Procedural History

On January 28, 1986, a Wisconsin state court jury found Wilson guilty of second-degree murder in Donald's death. Wilson challenged his conviction in the Wisconsin court of appeals. The case was reversed and remanded for a new trial, with the appellate court concluding that the trial court erred in failing to instruct the jury on the lesser included offense of reckless homicide. Wis. Stat.Ann. § 940.06 (West 1982). 145 Wis.2d 143, 426 N.W.2d 56 (App.1988). The Wisconsin Supreme Court reversed, and ordered the trial court to reinstate Wilson's conviction. Wilson then filed his habeas petition.

### II.

This case is before us under 28 U.S.C. § 2254(a), which provides that a court shall entertain a petition for habeas corpus "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." Wilson makes two arguments that his conviction was obtained in violation of the Constitution.

### A. Due Process Claim

Wilson's first claim is that he was denied due process of law under the Fifth and Fourteenth Amendments because the prosecutor did not indict him until sixteen years after his stepson's death. "Although statutes of limitation are the primary safeguard against the potential prejudice—i.e., faded memories, lost evidence, unavailable witnesses—that attends stale criminal charges, the due process clause plays a limited role in protecting against prosecutorial delay." *United States v. Anagnostou,* 974 F.2d 939, 941 (7th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct.

1943, 123 L.Ed.2d 649 (1993). However, "only the most egregious pre-indictment government delay—that which transgresses 'fundamental conceptions of justice' and 'the community's sense of fair play and decency' . . .—is proscribed by the constitution." *Id.* (quoting *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2048–49, 52 L.Ed.2d 752 (1977)).

Two different standards have developed in this circuit for establishing a violation of due process attributable to prosecutorial delay. *United States v. Koller,* 956 F.2d 1408, 1415 (7th Cir.1992). Under one line of cases, the defendant must first demonstrate that he suffered actual and substantial prejudice from the delay, and then the burden shifts to the government to show that the delay was necessary. In this analysis, once the defendant has demonstrated prejudice, the court must weigh the prejudice from the delay against the asserted reasons for delay. *See, e.g., United States v. Nichols,* 937 F.2d 1257, 1260 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 989, 117 L.Ed.2d 151 (1992); *United States v. Doerr,* 886 F.2d 944, 963–64 (7th Cir.1989).[4] In another line of cases, we have required the defendant to demonstrate both "(1) that the government delayed bringing the indictment in order to gain a tactical advantage; and (2) that the delay cause him actual and substantial prejudice." *United States v. Rein,* 848 F.2d 777, 781 (7th Cir. 1988); *United States v. Fuesting,* 845 F.2d 664, 669 (7th Cir.1988). We have employed this second standard, which is more burdensome for the defendant, in our most recent cases. *United States v. Dickerson,* 975 F.2d 1245, 1252 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1316, 122 L.Ed.2d 703 (1993); *Anagnostou,* 974 F.2d at 941. Several courts have noted this conflict but none has resolved it. *See, e.g., Pharm v. Hatcher,* 984 F.2d 783, 786–87 (7th Cir.1993); *Koller,* 956 F.2d at 1415; *United States v. Williams,* 738 F.2d 172, 175 (7th Cir.1984). Because Wilson has failed to establish unconstitutional prosecutorial delay under either standard, we decline to resolve this issue at this time.[5]

---

4. This was the test employed by the district court, which found that the defendant had suffered some prejudice but that it was outweighed by the state's asserted reasons for the delay.

5. The dissent would evaluate Wilson's claim under a previously unknown test, i.e., whether "the

### 1.

■ Both standards require Wilson to demonstrate that he suffered actual and substantial prejudice from the 16–year prosecutorial delay. *Koller*, 956 F.2d at 1415.[6] To make a showing of actual and substantial prejudice, "it is not enough to show the mere passage of time nor to offer some suggestion of speculative harm; rather, the defendant must present concrete evidence showing material harm." *Anagnostou*, 974 F.2d at 942. Wilson argues that the pre-indictment deaths of two potential defense witnesses, Dr. Wagner, the coroner who performed the autopsy on Donald's body and participated in the investigation of his death, and Darlene Wilson, Wilson's wife (and Donald's mother), prejudiced him. "[T]he death of a witness alone is insufficient to establish actual preju-

dice." *United States v. Valona*, 834 F.2d 1334, 1338 (7th Cir.1987). We

> "shall only conclude that the death of a witness has prejudiced a defendant where we are convinced that the witness would have testified, that his testimony would have withstood cross-examination, and that the jury would have found him a credible witness. . . . Further, even if we are convinced that an absent witness would have been a credible witness for the defendant, we must still evaluate this testimony against the other trial evidence to, determine if indeed its introduction would affect the trial outcome."

*Doerr*, 886 F.2d at 964 (citations omitted and internal punctuation deleted).

■ Wilson claims that Dr. Wagner's testimony would have helped him rebut the conclusions of the two pathologists who testi-

state acted in reckless disregard of [Wilson's] rights to speedy due process." Dissent at 1241. The dissent extracts this test from a footnote in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), in which the Supreme Court noted in passing that the Government conceded in its brief that a "due process violation might . . . be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense". *Id.* at 795 n. 17, 97 S.Ct. at 2051 n. 17. No matter how the dissent attempts to twist and turn this footnote, there is absolutely no basis for concluding that the *Lovasco* Court adopted this language as a constitutional standard. The dissent's position is particularly surprising given the Supreme Court's most recent pronouncement on the question in which the Court stated that "the Fifth Amendment requires the dismissal of an indictment . . . *if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense.*" *United States v. Gouveia*, 467 U.S. 180, 192, 104 S.Ct. 2292, 2299, 81 L.Ed.2d 146 (1984) (emphasis added). Thus, were we required to choose between the two tests we have employed in preindictment delay cases, *Gouveia* would be powerful support for adopting a requirement that defendants show actual prejudice caused by a purposeful, tactical delay by the prosecution.

The dissent insists that it is not rejecting our two "well-established standards for proving" due process violations because of prosecutorial delay, but merely creating "an additional circumstance under which a defendant could show that his

rights have been violated." Dissent at 1241 n. 1. It is difficult to evaluate this assertion since the dissent's proposed test is sketchily defined and its relationship to our prior precedent not discussed at any length. However, it is incontestable that a test that would find a constitutional violation based upon a showing of "reckless disregard" for speedy due process renders a finding of prosecutorial bad faith superfluous, thus eliminating the test described in *Gouveia* and applied in cases such as *Dickerson*, 975 F.2d at 1252. It is unclear, and left unexplained by the dissent, how the recklessness test would affect our cases which require a balancing of the reasons for delay against the prejudice caused to the defendant (*e.g. Nichols*, 937 F.2d at 1260), since the dissent does not define the nature of the prosecutorial conduct which would rise to the level of recklessness nor discuss what weight good faith reasons for delaying would be given in the constitutional analysis.

6. Wilson suggests in his brief that 28 U.S.C. § 2254(d) requires us to defer to the state trial court's determination that Wilson suffered actual and substantial prejudice from the 16–year delay. Section 2254(d), as we have already noted, directs federal courts in habeas proceedings to defer to the factual findings of state courts. Wilson cites no cases in support of the proposition that whether a defendant has suffered actual and substantial prejudice due to a pre-indictment delay is a question of fact. Our cases have treated the question as one of law requiring an independent determination by the appellate court. *See, e.g., Dickerson*, 975 F.2d at 1252; *Anagnostou*, 974 F.2d at 939; *Koller*, 956 F.2d at 1414; *United States v. Ashford*, 924 F.2d 1416, 1419–21 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 98, 116 L.Ed.2d 69 (1991). We do the same today.

fied for the state. Wilson points out that in 1973, when he was arrested for having sex with a minor and Donald's sisters first reported that Wilson had abused Donald, Dr. Wagner still concluded that he could not link any known conduct to Donald's fatal injuries. We note the conclusion of the district court that Dr. Wagner likely would have testified in favor of Wilson and that his testimony would have withstood cross-examination. However, as the district court stated in its decision, Dr. Wagner's "credentials, reputation, autopsy report and conclusions were introduced and received into evidence through his successor." The autopsy report included the following summation:

"Extensive investigation reveals the deceased fell about eleven separate witnessed falls in the past few weeks. Any of these could have caused his fractured ribs and the terminally related lacerated stomach. In the absence of a specific incident of force or trauma and without a lesion of the skin, we cannot relate any of the falls directly to the above findings.

"The cause of death is therefore shock and peritonitis following rupture of the stomach due to undetermined trauma."

Thus, Dr. Wagner's analysis and conclusions about Donald's death were presented to the jury. Wilson, as we have previously noted, called his own pathologist to the stand in an attempt to buttress the conclusions contained in Dr. Wagner's report. The prosecution countered this evidence with the testimony of two pathologists who implicated Wilson in Donald's death, and Donald's two sisters who recounted a nightmarish tale of physical abuse suffered by the child at Wilson's hands. In our opinion, Dr. Wagner's live testimony would not have shifted the balance of evidence presented to the jury. Thus, the absence of the witness Wagner did not rise to the level of actual and substantial prejudice to the defendant.

The dissent claims that we have "disregard[ed] the [federal] district court's finding and conclude[ed] that the defendant, David James Wilson, was not prejudiced by a sixteen-year delay in prosecution." Dissent at 1240. This is a misrepresentation of the majority's analysis. The district court found that the defendant suffered "some prejudice" from Dr. Wagner's death and from the loss of Dr. Siegel's office records, but made no finding that Wilson was "actually and substantially prejudiced." The district court went on to find that Wilson was not prejudiced by the death of his wife. And ultimately the federal trial court concluded that any prejudice Wilson suffered was outweighed by the "bona fide causes for the [pre-indictment] delay" and that "due process was afforded to the petitioner." The majority is thus in basic agreement with the findings of the trial court. It is surprising to be accused of disregarding those findings by a dissent which argues for overturning the trial court's decision.

The dissent states that Dr. Wagner "died just seventeen months before Wisconsin indicted Wilson. This fact alone—that prosecutors waited sixteen years and then indicted the defendant seventeen months after the death of his key witness—raises a strong inference of prosecutorial delay to gain tactical advantage. Why Wilson's counsel failed to make such an argument to this Court is mysterious." Dissent at 1240–41. Perhaps Wilson's counsel believed, as we do, that the argument lacked merit since it is not supported by any evidence. That is at least what we must assume in light of a letter sent by petitioner's attorney to this court correcting a misstatement in his brief erroneously asserting that Wagner died just one month before Wilson was indicted. In the letter, which we have appended to this opinion, counsel assured us that the *"error [in the brief] was unintentional and was not meant to mislead this court or to suggest that the State of Wisconsin waited for Dr. Wagner to die before charging Mr. Wilson."* (emphasis added). The letter is consistent with the district court's comment that *"petitioner concedes that the delay was not motivated by evil and was not designed to work a hardship on the defendant."* (emphasis added). The dissent completely ignores this statement by the district court, while at the same time, as we have noted, accusing the majority of disregarding the district court's findings. Thus, the dissent finds itself in the awkward position of advancing an argument expressly abandoned by the petitioner both in the dis-

trict court and on appeal because the petitioner's counsel determined that it was without merit. The dissent's insistence on questioning the motives of the Wisconsin prosecutors in the face of the petitioner's repeated waivers of the issue is, to say the least, puzzling. "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal question presented and argued by the parties before them." *United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir.1993) (citations omitted).

█ Wilson has *also* failed to demonstrate that his wife Darlene's death caused him actual and substantial prejudice. Wilson maintains that Darlene's testimony would have assisted his defense in several ways. We hold that none of the reasons put forth by Wilson demonstrates that his wife Darlene's absence from the trial caused him actual and substantial prejudice. Initially, Wilson argues that Darlene told police during the initial investigation that Wilson did not abuse Donald. Wilson believes that this testimony would have blunted the prosecution's evidence depicting him as a vicious child abuser. Donald's two sisters testified at trial, however, that they had never advised their mother of their knowledge of Wilson's abuse of Donald, because their stepfather threatened them that if they did, they would suffer similar beatings. This testimony would have severely undercut the value of Darlene's defense of her husband. Thus, the fact that Darlene was unavailable to testify that she did not observe Wilson abusing Donald caused the petitioner only slight prejudice.

Wilson also claims Darlene would have testified that Donald never blamed Wilson for his stomach pain while he was with her during the afternoon and evening before his death, and that this evidence would have helped him persuade the jury that he did not harm the child. Although four-year-old Donald, as he lay dying of a ruptured stomach, did not finger Wilson as his tormentor, neither did he tell his mother what caused the rupture of his stomach. Therefore, even had Darlene testified about Donald's deathbed silence about his injuries, the jury would have been left with the question it ultimately confronted: was the overwhelming circumstantial evidence of Wilson's guilt, absent any eyewitness account of the fatal blow, sufficient to find Wilson guilty beyond a reasonable doubt of second-degree murder? This prejudice argument also fails.

Wilson states that Darlene would have testified that Donald had a history of losing his balance, and he believes that this testimony would have given the jury an alternative explanation for his injuries. The petitioner points to no evidence in the record that would have supported this assertion about Darlene's testimony. Thus, it amounts to nothing more than self-serving speculation. Moreover, the two state pathologists testified that Donald's stomach tear could not have been caused by a normal household fall, but rather could only have resulted from a "concentrated high-energy blow" to the abdomen, like a punch or a kick. The verdict of the jury makes obvious that it found the state's evidence convincing beyond a reasonable doubt. The speculated testimony of Darlene that Donald lost his balance more than an average four-year-old in our opinion would have failed to rebut the state's case, because it would not have provided a credible alternative explanation for the boy's death.

Finally, Wilson contends that he was prejudiced by Darlene's death because she would have testified that she took Donald to be examined by Dr. Siegel, Donald's doctor, for rib injuries before Wilson moved into their apartment. Wilson once again speculates that this testimony would have overcome the prosecution's claim that he was physically abusing Donald. Again, Wilson cites no support in the record for his claim that Darlene would have testified in this manner. Furthermore, the fact that Donald was allegedly treated for rib injuries before Wilson actually moved into the apartment does not demonstrate that Wilson did not cause the rib fractures discovered at the autopsy. Moreover, the potential testimony would not have rebutted the eye-witness accounts of Donald's sisters of Wilson's mistreatment of their brother.

Wilson's contention concerning Darlene's visits to Dr. Siegel is related to his assertion that he was prejudiced because Dr. Siegel was unable to produce his office records at the time of trial. Siegel was the first doctor to examine the boy's fatal stomach injury and assisted in the futile emergency surgery the night before Donald's death. Unfortunately for Wilson, Siegel testified that Donald died from a sharp abdominal blow he incurred sometime after he ate the chicken soup Wilson prepared for him. This testimony was particularly damning because Wilson never contested the fact that he was alone with the boy during the afternoon Donald suffered the fatal injury to the stomach. We fail to see how Dr. Siegel's office records would have muted the effect of this most damaging testimony. Thus, Wilson again fails to demonstrate that he was actually and substantially prejudiced.

The dissent also accuses us of "lightly countenanc[ing] a sixteen-year delay in prosecution." Dissent at 1241. The charge is unfounded. We have not taken the delay lightly. Instead, we have done something the dissent has failed to do: carefully considered each of Wilson's arguments that he was so prejudiced by the delay that he was denied due process. After conducting this analysis, we join the district court in concluding that Wilson's conviction was free of constitutional violations.

## 2.

Even assuming that Wilson had demonstrated that he was substantially prejudiced by the sixteen-year preindictment delay, he still would not have succeeded in establishing a due process violation. Under the line of cases of which *Dickerson* is the most recent example, Wilson would be required to demonstrate that the prejudicial delay "was an intentional device [on the part of the prosecution] to gain tactical advantage over the accused." 975 F.2d at 1252. Wilson

conceded in the district court and again at oral argument that the prosecution did not intentionally delay its indictment in order to gain some tactical advantage over him. This admission is fatal to his due process claim under the standard employed in *Dickerson*.

Wilson would have had no more success under the standard used in cases such as *Nichols*, which require that, once the defendant has shown that the preindictment delay substantially prejudiced him, we weigh the prejudice suffered by the defendant against the Government's reasons for the delay. 937 F.2d at 1260. In Wilson's case, the state presented a very plausible reason for the delay: medical science's ability to detect child abuse was not nearly as well developed in 1969 (when Donald died) or 1973 (when the case was briefly reopened) as it was in 1985 when a conscientious and courageous Kenosha radio news director, David Cole, brought the results of Dr. Huntington's pathological report indicating child abuse to the attention of the local district attorney. The Government presented evidence to the district court which demonstrated that by 1985 pathologists, through more detailed research, investigation, and experience had developed a greater awareness and knowledge that otherwise unexplained abdominal tears in infant children are frequently the result of child abuse. We agree with the well-reasoned opinion of the Wisconsin Supreme Court that Wilson "has shown nothing to cause us to doubt the state's" explanation for the delay. 440 N.W.2d at 545. The district court also concluded that the prosecution had presented "bona fide causes" for the delay. Thus, even if Wilson had established that he was substantially prejudiced by the 16-year preindictment delay, he would still have failed to make out a due process violation under the *Nichols* line of cases because the state's reasons for the delay outweigh any prejudice he may have suffered.[7]

---

7. The dissent would remand the case to the trial court to allow Wilson to establish that the Government acted recklessly in delaying his indictment for sixteen years. We cannot imagine what conceivable purpose would be served in allowing Wilson another opportunity to attack his conviction. Wilson has had ample opportunity to make all the allegations he desired about the Government's methods and prosecutors and to place in the record any facts which would support a contention that the Government acted inappropriately. Instead, Wilson has conceded that the state of Wisconsin did not delay bringing the charge in order to undermine his defense. The relevant

### B.

██ Wilson's second challenge to his conviction is that he was denied due process by the state trial court's refusal to instruct the jury on the offense of reckless homicide. The state trial court instructed the jury only on the offense of second-degree murder. The petitioner claims that he was entitled to the reckless homicide instruction because it is a lesser included offense of second-degree murder. Wilson carries a heavy burden in his attempt to gain a reversal of his conviction on these grounds. "The failure to instruct on a lesser included offense, even if incorrect under state law, does not warrant setting aside a state conviction unless failure to give the instruction could be said to have amounted to a fundamental miscarriage of justice." *Williford v. Young,* 779 F.2d 405, 406 (7th Cir.1985), *cert. denied,* 476 U.S. 1120, 106 S.Ct. 1982, 90 L.Ed.2d 664 (1986) (quoting *Nichols v. Gagnon,* 710 F.2d 1267, 1269 (7th Cir.1983), *cert. denied,* 466 U.S. 940, 104 S.Ct. 1918, 80 L.Ed.2d 465 (1984)). A fundamental miscarriage of justice occurs from a failure to tender an instruction when "*credible* evidence in the record would support a verdict based on the [the omitted] instruction." *Taylor v. Gilmore,* 954 F.2d 441, 451 (7th Cir.), *cert. granted,* —— U.S. ——, 113 S.Ct. 52, 121 L.Ed.2d 22 (1992) (citation omitted).

We agree and the Government does not dispute that under Wisconsin law reckless homicide was a lesser included crime of the crime of second-degree murder in that the elements of reckless homicide form a subset of the elements of second-degree murder.[8] At the time of Wilson's trial, a person was guilty of reckless homicide under Wisconsin law if they caused the death of another human being by creating a situation of unreasonable risk and high probability of death or great bodily harm to another and which dem-

onstrates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating injury. Wis.Stat. Ann. § 940.06. A person could be found guilty of second degree homicide under Wisconsin law if they caused the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life. Wis.Stat. Ann. § 940.02. The difference between the two crimes was that second-degree murder required a showing that the defendant engaged in conduct evincing a depraved mind, an utter disregard for human life, while reckless homicide required that the defendant demonstrated a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. Thus, reckless homicide was a lesser included offense of second-degree murder.

The Wisconsin Supreme Court, however, properly ruled that the record was barren of that quantum of evidence required to support a conviction for reckless homicide. The Court, in rejecting Wilson's argument that the trial court should have given the jury a reckless homicide instruction, stated that the

> "differentiating factors between second-degree murder and reckless homicide are the actor's conduct and state of mind. As to conduct, second-degree murder contemplates an act imminently dangerous to another whereas reckless homicide contemplates an act creating a situation of unreasonable risk and high probability of death or great bodily harm. See sections 940.02 and 940.06(2) ... As to state of mind, second-degree murder contemplates a depraved mind whereas reckless homicide contemplates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury."

*Wilson,* 149 N.W.2d at 542.

Wilson's actions in murdering Donald were far above and beyond the standard of reck-

---

facts of the case are contained in the record, and thus a remand would be senseless.

8. Wisconsin now refers to second-degree murder as first-degree reckless homicide. Wis.Stat.Ann. § 940.02 (1992). The substantive elements of the offense have not been altered. Reckless homicide has been renamed second-degree reckless homicide. Wis.Stat.Ann. § 940.06 (1992). Again, the substantive elements of the offense

have not been altered. These statutes have been rewritten to underscore that both require criminal recklessness, but that first-degree reckless homicide (formerly second-degree murder) has the additional aggravating factor of circumstances which show utter disregard for human life. *See* Judicial Council Committee Note following Wis.Stat.Ann. § 940.02 (1992).

less homicide. The evidence against Wilson demonstrated that Donald died as a result of the fatal injuries he received while in the exclusive care, custody and control of the defendant, and that those injuries were of a nature that could not have been caused by an unexplained accident. According to the testimony of the state's witnesses, the child died from a sharp, high-energy blow to the stomach. Forcefully kicking or punching a four-year-old child in the stomach does not merely create "a situation of unreasonable risk and high probability of death or great bodily harm" (as in reckless homicide); it is an act that is "imminently dangerous to another" (as in second-degree murder). Moreover, striking such a blow evinces more than just "a conscious disregard for the safety of another" (reckless homicide); it is evidence of a depraved mind (second-degree murder). Indeed, if delivering a calculated, high-energy, fatal blow to the abdomen of a four-year-old child is not the work of a depraved mind, it is hard to imagine what is.

Wilson argues that the evidence presented to the jury provided support for another explanation for the boy's death. He claims in his brief that there was "evidence that Wilson used physical force to discipline Donald when trying to teach him not to wet his bed. It is reasonable that a jury could find that Donald's injuries occurred ... while discipline was being imposed in a reckless manner." [9] Wilson made a similar argument before the Wisconsin Supreme Court, arguing there that "[p]erhaps he threw Donnie toward a bed where Donnie landed, without any plan by [the defendant], on some protruding object, or perhaps he pulled Donnie from a top bunk upon finding him poised to follow his sister's habit of jumping from one top bunk to the other, only to have him land upon some sharp toy on the floor." 440 N.W.2d at 543. The Wisconsin Supreme Court concluded that "there is not sufficient evidence in the record which would reasonably support a finding of such conduct on the part of the defendant." *Id.* The Court explained that

"After reviewing [the] evidence, we conclude that the evidence and the reasonable inferences drawn therefrom are insufficient to support a conviction of the defendant on the lesser-included offense of homicide by reckless conduct. There is simply not enough evidence in the record which would support, directly or circumstantially, the conclusion that the defendant acted in a manner creating a high degree of unreasonable risk of great bodily harm evincing a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury on the day in question."

*Id.*

We agree. Wilson has failed to direct us to any evidence in the record that can reasonably explain Donald's death in any way other than by a punch or kick he delivered to the boy's abdomen (conduct which constitutes second-degree murder), or any evidence that creates a reasonable doubt as to his guilt. The evidence demonstrated that the boy died from a sharp blow to the abdomen while in the custody of the defendant. The jury was free to believe that the defendant caused Donald's death by delivering the blow or that he did not. If they believed he did, then they were required to convict him of second-degree murder. If they believed he did not, they were required to acquit him. The record does not support a verdict that Wilson was guilty of reckless homicide in Donald's death. It was not a fundamental miscarriage of justice for the district court to decline to instruct the jury on the lesser included offense of reckless homicide.

### III.

As we noted above, the Supreme Court has made clear that "only the most egregious pre-indictment government delay—that which transgresses 'fundamental conceptions of justice' and 'the community's sense of fair play and decency' ...—is proscribed by the constitution." *Lovasco,* 431 U.S. at 790, 97 S.Ct. at 2049. The delay in Wilson's case fails to meet this standard. The district

---

9. Wilson provides no citation in the record that would support his assertion that it contains evidence that he disciplined Donald for wetting his bed.

court's denial of Wilson's habeas petition is AFFIRMED.

### APPENDIX

*(Letterhead Of)*

### LOYOLA UNIVERSITY CHICAGO SCHOOL OF LAW

March 23, 1992

Gary H. Wente
Operations Manager
United States Court of Appeals
for the Seventh Circuit
219 S. Dearborn St.—Suite 2722
Chicago, IL 60604

Re: WILSON v. McCAUGHTRY
No. 90–1017

Dear Mr. Wente:

I wish to correct an erroneous statement which appeared in Appellant's brief, at p. 15, last paragraph. Dr. Harold Wagner died on 3/20/84. The indictment of appellant David J. Wilson was filed on 8/21/85. Therefore, Dr. Wagner's death preceded the indictment by 17 months, not by one month as stated in the brief. The error was unintentional and was not meant to mislead this court or to suggest that the State of Wisconsin waited for Dr. Wagner to die before charging Mr. Wilson.

Sincerely yours,

/s/ Alan Raphael
ALAN RAPHAEL
Professor of Law
Loyola University Chicago
School of Law
One East Pearson Street
Chicago, IL 60611
(312) 915–7140
COUNSEL FOR
PETITIONER–AP-
PELLANT
DAVID J. WILSON

CUMMINGS, Circuit Judge, dissenting.

I respectfully dissent. The majority disregards the district court's finding and concludes that the defendant, David James Wilson, was not prejudiced by a sixteen-year delay in prosecution. I would submit that if prosecutorial delay did not prejudice this case, no delay will ever give rise to a showing of prejudice. The state conducted two earlier investigations into the heinous death of Wilson's four-year-old stepson, Donald John Miller. Wilson was not indicted after these earlier investigations because of the exonerating testimony of two key witnesses: the coroner who performed the autopsy on Donald and investigated his death, and Donald's mother. The coroner testified that Wilson's conduct could not be linked to the boy's death, and the mother testified that Wilson did not beat her son. Both witnesses were dead by the time Wisconsin got around to prosecuting Wilson. Also lost were records from Donald's doctor supporting his mother's testimony in an earlier proceeding that the child was clumsy and prone to injuries. It strains credulity to argue, as does the majority, that written, out-dated statements from a deceased witness are an equal substitute for a living and breathing person with direct knowledge of the case testifying on a defendant's behalf. The majority quotes *United States v. Valona*, 834 F.2d 1334, 1338 (7th Cir.1987), for the proposition that "the death of a witness alone is insufficient to establish actual prejudice." True enough; but not all witnesses are created equal. If the deaths of the defendant's two star witnesses, both with direct knowledge of the facts, do not prejudice the defense, what does?

The majority also errs, in my opinion, in stating flatly that Wilson could not make out a due process violation because the delay, even if prejudicial, was not an intentional ploy by the prosecutor to gain tactical advantage. The coroner died just seventeen months before Wisconsin indicted Wilson. This fact alone—that prosecutors waited sixteen years and then indicted the defendant shortly after the death of his key witness—raises at least the inference of prosecutorial delay to gain tactical advantage. Why Wilson's counsel failed to make such an argument to this Court is mysterious. The majority also ignores language in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 that a due process violation might also arise in some circumstances not involving prosecutorial misconduct. Accord-

ing to *Lovasco*, a due process claim "might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense." 431 U.S. at 795 n. 17, 97 S.Ct. at 2051 n. 17 (quoting government's brief).[1] I take "reckless disregard" to mean that even though a defendant may not actually be able to prove bad intent by a prosecutor, at some point a delay, offered without justification, becomes unacceptably reckless toward the defendant's interest in speedy due process. Though I am inclined to believe that a delay of this length offered for these reasons is reckless *per se*, I would remand for a hearing as to whether the prosecutors in this case did indeed act in reckless disregard of Wilson's rights.

The majority cites no decisions, and I am aware of none, in which this Court has tolerated a prosecutorial delay as long as sixteen years or anything even remotely similar. See *United States v. Zukowski*, 851 F.2d 174 (1988), certiorari denied, 488 U.S. 868, 109 S.Ct. 174, 102 L.Ed.2d 144 (one-year delay); *United States v. Fuesting*, 845 F.2d 664 (1988) (less than one-year delay); *United States v. L'Allier*, 838 F.2d 234 (1988) (sixteen-month delay); *United States v. Rein*, 848 F.2d 777, 781 (1988) (less than one-year delay); *United States v. Antonio*, 830 F.2d 798 (1987) (three-year delay); *United States v. Williams*, 738 F.2d 172 (1984) (four-year delay); *United States v. Solomon*, 688 F.2d 1171 (1982) (three-year delay). The government offers two reasons for the delay: Donald's sisters feared reprisal, and advances in medical literature in 1977 linked ruptured stomachs to child abuse. Yet the sisters came forward as early as 1973 and their testimony precipitated a second investigation into Donald's death that same year; their testimony, then, cannot explain why the government waited until 1985, twelve years later, to indict Wilson. Advances in medical

science are an equally poor excuse for the delay in this case. Even taking the government's claim at face value, these supposedly groundbreaking medical treatises were published in 1977. Why, then, did the state wait another eight years to pursue Wilson? The most benign interpretation is that prosecutors forgot about Donald's gruesome death— forgot, that is, until a radio announcer resurrected the case and the prosecutors felt the flush of public pressure.

The majority's exhaustive depiction of this hideous crime is heart-rending. However, we must also be vigilant against abuses of the government's awesome power to prosecute people deemed innocent until a jury finds otherwise. In my opinion, we should not so lightly countenance a sixteen-year delay in prosecution where the defendant's two best witnesses have died and the government's explanations are, at best, unconvincing. As Judge Gordon found, defendant has already proved that the delay actually prejudiced his case. On remand Wilson should be permitted to prove that the state acted in reckless disregard of his rights to speedy due process.

---

1. *United States v. Gouveia*, 467 U.S. 180, 192, 104 S.Ct. 2292, 2299, 81 L.Ed.2d 146, does not eliminate the possibility of proving a due process violation for a reckless delay. *Gouveia* merely reinforces the point that a delay for tactical advantage causing actual prejudice also violates the Due Process clause. Also, the majority's statement that I would overthrow two existing tests for establishing due process violations misconstrues my point. I believe *Lovasco* creates an additional circumstance under which a defendant could show that his rights have been violated; it does not do away with these other, well-established standards for proving such violations.