UNITED STATES of America, Plaintiff–Respondent,

v.

Jerald ENGSTROM, Defendant–Appellant.

No. 91–4072.

United States Court of Appeals, Tenth Circuit.

May 22, 1992.

Tena Campbell, Asst. U.S. Atty. (Paul M. Warner, U.S. Atty., with her on the brief), Salt Lake City, Utah, for plaintiff-appellee.

Randall W. Richards (John T. Caine, with him on the brief), Ogden, Utah, for defendant-appellant.

Before LOGAN and BRORBY, Circuit Judges, and OWEN, District Judge.*

OWEN, District Judge.

Defendant-appellant Jerald N. Engstrom, a former vice-president and general counsel of the Commercial Security Bank, appeals from a conviction by a jury in the District Court for the District of Utah on charges of misapplication of $2,081,712.67 of his bank's funds, a violation of 18 U.S.C. § 656. On April 25, 1991, Engstrom was sentenced to a one-year prison term.

On appeal he asserts that the Court committed prejudicial error in allowing evidence of what he terms certain prior "bad acts" to be put before a jury, and that his Fifth Amendment due process rights were violated by the government's four year delay prior to obtaining the indictment. Because we find that the prior acts in question were all related to the same scheme and series of events for which Engstrom was convicted, and because Engstrom did not prove that the delay caused him substantial prejudice or that the government caused it to gain a tactical advantage, we affirm.

The facts are as follows: in the summer of 1984, Engstrom had become involved with a group of people who were forming a corporation called Double J Express Western, Inc. to purchase the bankrupt IML terminal in Salt Lake City, Utah. Engstrom was told by his superiors in the bank that the bank was not to have any of its money involved in the transaction, and Engstrom was to have no personal interest in the transaction himself. However, from certain evidence it appears that Engstrom was to receive 2,500 shares of the stock in the new deal, and a stock certificate for his shares was issued to be held by someone else as trustee for him. Engstrom himself testified that he got the shares but returned them and did not have an ownership interest in Double J. From other evidence, it appears that Engstrom was also a director of Double J, and was to have been its general counsel. It was his testimony at trial that he never served as a director.

During the fall of 1984, Engstrom represented to the trustee of the IML bankruptcy that an escrow account of $100,000 had been established at CSB by Double J, which amount would be forfeited if the transaction did not close on time. This statement was false; no such account was opened, nor any money tendered. Based on this representation, preparations were made to sell IML to Double J. At the same time, Engstrom was falsely assuring his supervisor and the president of CSB that he had no personal interest in the IML transaction, and that the bank had no funds involved.

The transaction did not timely close, however, and the closing date for the deal was postponed on condition that an additional $50,000 be placed in the escrow account by Double J. Engstrom wrote a letter certifying that this had been done, although there was still neither money nor an account. At

---

* The Honorable Richard Owen, Senior United States District Court Judge for the Southern District of New York, sitting by designation.

that time Engstrom also told a local attorney who was representing Double J in the purchase that ownership of Double J had changed, and that an entity called Meggs, Inc. would now be the major shareholder and would provide the money to purchase the IML terminal.

When the sale had still not closed and Engstrom sought a further delay, he signed a letter asserting that another $100,000 would be placed in escrow, bringing the total amount in the alleged escrow account to $250,000. This too was false; there was no money and no account. On May 1, 1985, under pressure from the trustee in bankruptcy, there having been no closing, Engstrom signed and delivered a CSB bank check payable to the order of the IML trustee in the amount of $256,712.67, stating that this represented the amount of money in the fictitious escrow account.

Following this, four other misapplications of bank funds occurred when Engstrom sent from CSB bank checks to banks in Texas, simultaneously depositing four checks of one Ed Harper in the Meggs account to cover this amount. Engstrom's account of these transactions fully justified the jury concluding that Engstrom knew the Harper checks were worthless. The Ed Harper checks were in fact ultimately returned for insufficient funds, and the bank as to them suffered a loss of $1,815,000, bringing its total loss from the IML transaction to $2,081,712.

■ Additionally, at trial, as a related act, the government introduced a "pre-advice letter" authored by Engstrom in December 1984, in which Engstrom sent a document to the Texas American Bank in Fort Worth, Texas, stating that CSB irrevocably guaranteed for thirty days that Meggs had funds in the amount of $328,500,000, available to be transferred within seventy-two hours of notice. This representation was also false, and the president of CSB testified that not only was such a letter of credit not authorized, but also that the issuance of this letter could have ruined CSB if anyone had relied on the representations. Engstrom claims evidence of this

letter should not have been received. We disagree as we do not view this evidence as evidence of "other crimes" within the ambit of Fed.R.Evid. 404(b), but as part of the overall scheme. *See United States v. Record*, 873 F.2d 1363, 1372 n. 5 (10th Cir.1989).

■ Engstrom argues that the indictment and conviction should be dismissed for the four year pre-indictment delay, claiming that this delay violated his Fifth Amendment due process rights. A letter in the record from the then-Assistant United States Attorney on the case to Engstrom dated July 2, 1986, indicates that a plea offer was extended at that time; at oral argument the government asserted that the case was transferred from one Assistant to another due to the pressures of other cases and that the possibility of a plea was desultorily explored by a number of these Assistants without fruition until the indictment was returned on May 29, 1990. Since the inquiry here is primarily factual, the district court's determination is reviewable under a clearly erroneous standard. *United States v. Roberts*, 898 F.2d 1465, 1469 (10th Cir.1990).

In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) and in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the Supreme Court has held that delay is inexcusable only if it results in actual prejudice to the defendant. In both of those cases, the Court did not find that actual prejudice had been caused, and therefore did not elaborate the circumstances that must be shown to prove such prejudice. The due process clause of the Fifth Amendment has only "a limited role to play in protecting against oppressive delay ..." and the due process inquiry must consider "the reasons for the delay as well as the prejudice to the accused." *Lovasco*, 431 U.S. at 789, 790, 97 S.Ct. at 2049. Pre-indictment delay does not violate due process in the absence of such a showing. Later Supreme Court discussions of *Marion* and *Lovasco* have stressed "the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based

on loss of evidence attributable to the Government." *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988).

This Court, thereafter examining pre-indictment delay, has further held that there must be both a showing of actual prejudice and evidence that the delay was purposeful in order to gain a tactical advantage. *United States v. Comosona,* 848 F.2d 1110, 1113 (10th Cir.1988), *citing United States v. Padilla,* 819 F.2d 952, 962–63 (10th Cir. 1987). The burden of proof of making this showing is on the defendant. *Perez v. Sullivan,* 793 F.2d 249 (10th Cir.1986).

 Accordingly, a defendant must meet this two-pronged test. *United States v. Gutierrez,* 696 F.2d 753, 755 (10th Cir. 1982), *cert. denied,* 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983). Engstrom has not met either of the prongs. He has failed to show any actual prejudice here, beyond his mere allegations. Engstrom claims that several witnesses suffered failures of memory due to the lapse of time of over five years until the indictment was brought. The trial transcript references on this subject to which Engstrom directs the Court provide a little support for this claim—understandable given the passage of almost seven years between the events and the trial. However, the various witnesses' recollections were more than adequate on material matters to satisfy any standard of fairness and due process.[1] One witness had taken notes at the time of the events in question, and was able to refer to them. Consequently, Engstrom fails to point to any specific prejudice that the delay caused him, and general allegations of prejudice do not suffice to carry the day.

Engstrom has also failed to meet the second prong of the test; he has not shown that the delay was purposely caused by the government to gain tactical advantage. The government, as mentioned earlier, at-tributes the delay to its belief that plea negotiations would bear fruit, and to a heavy and active criminal docket in its office with a consequent number of shifts of the case from one Assistant U.S. Attorney to another.[2] Additionally, the government noted that plea offers being negotiated with Engstrom beginning in 1986 continued as late as 1990. Even if the government had purposely caused the delay, which Engstrom has neither pleaded nor proven, the appellant has not alleged nor does the record suggest that the government obtained any specific tactical advantage thereby.

Accordingly, the conviction is affirmed.

---

1. Engstrom's own vagueness in the face of strong documentary and testimonial evidence against him is certainly understandable.

2. Any desire of the defendant for speedy action here may well have been tempered by his awareness of the ever-increasing possibility that the statute of limitations would run and bar the charges completely.