Filed:  October 8, 1996

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 95-6383
(CA-91-585-R)

Benjamin Henderson Jones,

Petitioner - Appellant,

versus

Ronald J. Angelone, Director, Department of
Corrections of the Commonwealth of Virginia,

Respondent - Appellee.

O R D E R

The Court amends its opinion filed September 3, 1996, as follows:

On the cover sheet, section 2 -- the name of the appellee is corrected to read "Ronald J. Angelone, Director, Department of Corrections of the Commonwealth of Virginia."

On page 15, first full paragraph, line 9 -- the word "effected" is corrected to read "affected."

On page 16, first paragraph, line 9 -- the semicolon after the word "past" is deleted and replaced with a comma.

For the Court - By Direction


/s/ Patricia S. Connor
_____
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BENJAMIN HENDERSON JONES,
Petitioner-Appellant,

v.

RONALD J. ANGELONE, Director,
Department of Corrections of
the Commonwealth of Virginia,
Respondent-Appellee.

No. 95-6383

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, District Judge.
(CA-91-585-R)

Argued: June 6, 1996

Decided: September 3, 1996

Before MURNAGHAN, WILKINS, and LUTTIG, Circuit Judges.

_____

Affirmed by published opinion. Judge Luttig wrote the majority opinion, in which Judge Wilkins joined. Judge Murnaghan wrote an opinion concurring in the judgment.

_____

**COUNSEL**

**ARGUED:** Michelle Jeanette Anderson, Appellate Litigation Clinical Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. Linwood Theodore Wells, Jr., Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee. **ON BRIEF:** Steven H. Goldblatt,

Amy J. Fastenberg, Student Counsel, Brian A. Hill, Student Counsel, Appellate Litigation Clinical Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. James S. Gilmore, III, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

**OPINION**

LUTTIG, Circuit Judge:

Appellant, Benjamin Henderson Jones, fled the Commonwealth of Virginia after murdering his mother and half-brother on January 8, 1975. He eluded authorities until April 20, 1975, when he was arrested in New York City on unrelated charges of armed robbery. As soon as Virginia officials learned that Jones was in New York, they began efforts to obtain temporary custody of him. New York refused to temporarily surrender Jones to Virginia officials, and, over the next ten years, Virginia officials made repeated, but unsuccessful, efforts to have Jones returned to Virginia. Finally, on January 28, 1986, Virginia officials succeeded in their efforts to have Jones returned to the Commonwealth. Jones was then indicted, tried, and convicted of murdering his mother and his half-brother, and sentenced to life imprisonment plus twenty years. After exhausting his state remedies, Jones filed a petition for writ of habeas corpus in the federal district court challenging his state murder conviction. Jones alleged, inter alia, that his conviction was obtained in violation of the Due Process Clause of the Fifth Amendment because of the delay between the commission of the murders and his arrest on those charges. The district court, after holding an evidentiary hearing, denied habeas relief. Finding no error, we now affirm.

I.

In the early morning hours of January 8, 1975, Jones shot and killed his mother, Marie Gladys Jones, and his half-brother, William Anthony Hall, as they slept in their home in Wise County, Virginia. Later that same day, the Wise County Sheriff's Department issued an arrest warrant for Jones, relying on the eye-witness accounts of the

2

shootings provided by Jones' siblings. At the time the warrants issued, Jones' whereabouts were unknown to Virginia authorities.

A week after the murders, on January 15, 1975, an Assistant Commonwealth's Attorney for Wise County, Joseph Kuczko, wrote to the United States Attorney in Roanoke, Virginia, seeking the FBI's assistance in locating Jones, requesting that federal warrants for unlawful flight be issued, and suggesting that Jones might be found in New York. J.A. at 168. When Wise County officials thereafter learned that Jones was in fact in New York, they sent a letter to the New York City Police Department requesting that New York surrender Jones to Virginia once he was apprehended. The letter, which was accompanied by two warrants for murder to serve as detainers, J.A. at 167, informed the New York authorities of Virginia's intent to seek Jones' extradition if Jones was unwilling to waive extradition. J.A. at 167.

Jones was arrested for armed robbery in New York City on April 20, 1975. J.A. at 41. On July 16, 1975, prior to Jones' trial and conviction for this robbery, Jones was transported to a New York state court, where he was informed by his lawyer that two officials from Virginia were seeking to extradite him on the Virginia warrants for the murder of his mother and half-brother. J.A. at 43-44, 56-57. Precisely what transpired at the court on July 16 is unclear. But, according to Jones' own testimony, he was brought to a New York Court at 100 Centre Street in New York City on that day and "told by a Lawyer that there were two assistant attorney generals in Court from Virginia," J.A. at 43, and that "they were trying to extradite [him] back" on the warrants for murder. J.A. at 57. Jones testified that, although he "didn't appear in Court [him]self," his "Lawyer told [him] that the Judge dismissed the complaints and the warrants." J.A. at 43-44; see also J.A. at 18-19; Supp. J.A. at 4 (Jones' sworn affidavit) ("[E]xtradition proceedings were held in Supreme Court, New York County, 100 Centre Street in 1975. They were dismissed for failure of the governor to issue a warrant."). As the magistrate found, the Commonwealth's efforts to have Jones returned to Virginia for trial ultimately proved unsuccessful. J.A. at 18-19.

Insofar as can be determined, Virginia next formally attempted to obtain custody of Jones in 1982. J.A. at 19 (finding of fact). As noted by the district court, it appears that at that time Virginia renewed its

3

efforts to obtain Jones for trial because of the reappearance of an eye-witness with whom officials had understandably lost contact following New York's initial refusal to allow Virginia temporary custody of Jones. J.A. at 19. Among other actions taken by Virginia officials to obtain custody of Jones in 1982, Kuczko wrote the head of the prison in New York where Jones was incarcerated and requested temporary custody of Jones, filed Form V of the Interstate Agreement on Detainers, and completed an application for extradition under the Uniform Criminal Extradition Act. J.A. at 19, 158-65. As found by the magistrate, "Jones admitted to going to court in 1982 regarding the charges in Virginia, but it is unclear what happened because Jones was removed from the courtroom after becoming involved in an argument." J.A. at 19. According to Jones' testimony, during these proceedings he "cussed the Judge out" and "told [the guards] when the cuffs come off, if you put your hands on me, I will try to kill as many of you as I can in defense of myself." J.A. at 45. As they had been in 1975, however, the Wise County authorities were again unsuccessful in having Jones returned to Virginia. J.A. at 19 (finding of fact).

Throughout 1985, Virginia made numerous additional efforts to obtain Jones. See, e.g., J.A. at 50, 146-51, 155. As with its earlier efforts, these efforts, too, were rebuffed either by New York State (apparently, in part because it wanted assurances that Jones was ineligible for capital punishment, see J.A. at 122, 129; Supp. J.A. at 1),[1]

_____

[1] As our specific citations to the record reflect with respect to this point, it is all but certain that a concern on behalf of officials in New York that Jones might be subject to the death penalty underlay that State's refusal readily to volunteer Jones for extradition. As the Assistant Commonwealth Attorney testified under oath:

> When I got him back, I had to sign a letter to the Governor of New York that the death penalty would not be requested in these cases.
>
> . . .
>
> [The Governor of New York] said that before he would sign the extradition warrant for us to come and get him that he had to have in his file that Virginia was not asking for the capital punishment, which we did not have at that time, really.

J.A. at 122, 129 (testimony of Joseph Kuczko). In fact, in obvious response to a request for assurance from the State of New York, the

4

or by Jones, who vigorously contested extradition, refused to sign papers allowing Virginia officials to bring him back to Virginia, and filed a petition for a writ of <u>habeas corpus</u> in New York state court challenging the Virginia warrants, <u>see</u> J.A. at 45, 47, 48, 114, 146-51, 155; Supp. J.A. at 2-5. In fact, from 1982 forward, it appears that Jones may have attempted to thwart Virginia's efforts by violating prison regulations in order to postpone his parole date and the exchange of custody. J.A. at 19-20, 109-10, 112, 122, 130-31.**2**

_____

Assistant Commonwealth Attorney in Virginia wrote as follows to the Executive Secretary to the Governor of New York, in a letter dated October 28, 1985:

> Please be advised that Benjamin Henderson Jones' maximum punishment for the murder of his mother and half-brother is life imprisonment on each killing. . . . It was not until 1981 that Virginia's capital murder statute was amended to include a wilful, deliberate and premeditated killing of more than one person as a part of the same act or transaction. Therefore, the capital murder statute is not applicable to Jones.

Supp. J.A. at 1.

**2** The Assistant Commonwealth Attorney repeatedly testified under oath to the fact that New York officials repeatedly informed him that Jones continually violated prison rules in order to avoid extradition to Virginia. The following is illustrative:

> [W]e kept in touch with the New York authorities at Sing-Sing and Dannemora Prison in New York, and every time they would tell us that he was coming up for release, then when we lined up to get him, they would call back and say, "Don't come because he violated some rule. He doesn't want to go back to Virginia, and we cancelled his good time. So he is not going to be released at this time," and that is the way it went on.
> . . .
>
> [T]hey would say, "We will let you know when he is coming up for release," and then every time we would get ready, I would have the deputies lined up to go up there, they would call back and say, "Hold it. He has violated the rules <u>intentionally</u>, because he doesn't want to go back to Virginia."

J.A. at 109-110, 122 (emphasis added). The Assistant Commonwealth Attorney even provided the same information to the court itself in response to direct questioning:

5

Virginia officials finally succeeded in having Jones returned to Virginia on January 28, 1986. He was indicted on July 21, 1986, and, on January 28, 1987, Jones was finally tried for the murder of his mother and his half-brother.**3** Jones' defense at trial was that he could not have committed the murders because he was living at the Elk Hotel in New York City continuously from December 23, 1974, until April 20, 1975. After hearing the evidence, which included Jones' siblings' eye-witness accounts of Jones shooting his mother and half-brother multiple times,**4** the jury convicted Jones of both murders, sentencing

_____

> Q: THE COURT. Are you aware of anything that Mr. Jones was doing in New York that prevented him being brought back to Virginia, other than the fact that he was in prison?
>
> A: THE WITNESS. Well, just what the officials would tell me, that, "We had to cancel his release and the schedule that we gave you because he violated some regulations and his good time has been cancelled, and he is not going to be turned loose to you all like we told you last month," and that went on a few times. They knew and I knew that he didn't want to come back to Virginia.

Id. at 130-131.

**3** "Much of this year-long delay [between Jones' extradition to Virginia and his trial] was due to motions for continuance and discovery by Jones." Jones v. People of the Commonwealth of Virginia, No. 92-6989, 1993 WL 62079, at *1 (4th Cir. Mar. 8, 1993).

**4** According to the concurrence, Jones' brother, James Jones, was not an eyewitness to the murders. Post at 26-27 n.5. In fact, he was. Indeed, his testimony was as incriminating as (and quite likely more so than) the testimony of his sister, Mary Jones Hardy; indeed, one could not honestly read James Jones' testimony in any other way than as confirming that he saw his brother Benjamin commit the murders. It is only through a play on words that it can be maintained in any sense at all that James was not an eyewitness to the murders committed by the brother -- specifically, a play on the predicate "eye" in "eyewitness" such that, although James saw Benjamin fire the shots that killed his mother and half-brother, it can be said that he did not actually see that Benjamin committed the murders because he did not literally see Benjamin pull the trigger (either because it was too dark for James to discern the actual pulling of the trigger or because Benjamin was positioned such that James could see Benjamin shoot the victims, but could not actually see the gun itself). James Jones' self-explanatory testimony was as follows:

6

him to life imprisonment for the murder of his mother and to twenty years for the murder of his half-brother.

_____

CROSS-EXAMINATION BY MR. ADKINS:

Q: And so you were at home [the night of the murders] --

A: All that night.

Q: And went to sleep?

A: Yes, sir.

Q: And then, as I understood your testimony, you heard the door -- heard something --

A: Bust open.

Q: Bust open? And then you saw this bunch of blue flashes?

A: Yeah.

Q: And you don't know where they came from?

A: I know where they came from.

Q: Who was firing them or what?

A: Yeah, to see anybody actually pull the trigger, no, I didn't, but to know where they came from, yes, I do.

Q: Well, are you saying they were gunshots?

A: Of course.

Q: O.k., and -- but as to who was doing the shooting, you do not know?

A: I didn't see nobody pull the trigger, I was in a different room.

Q: And you remember no conversation with anyone?

A: Me, I didn't say nothing period.

Q: And you actually, then, saw no one shot?

A: See somebody shot, no. I stayed in my bed. There was nothing I could do.

Q.: Well, did you ever get up at all?

A: Yes, I did.

7

After his conviction became final, Jones filed the instant habeas corpus action, raising eight issues. The district court dismissed the petition, holding that seven of the claims were procedurally defaulted. The district court held that Jones' remaining claim, that the delay between his arrest in January 1986 and his trial in January 1987 violated his right to a speedy trial, was meritless. On appeal, we affirmed

---

Q: I mean did you get up at the time of this or was it later on you got up?

A: After the shooting, I got up. When he asked me to get up, I got up. And besides that -- and I didn't say a word, I just got up, I couldn't say anything. I didn't have anything to say.

Q: There could have been people in the house that night that you did not know about, then, or did not see?

A: No.

Q: You don't know whether anyone else was in there or not?

A: There wasn't nobody else in there. I slept right by the front door, in the front door, in fact.

REDIRECT EXAMINATION BY MR. CALLEN:

Q: You say someone told you to get up, who told you to get up?

A: Benny [Benjamin Jones].

Q: How long was Benny there, would you estimate, to the best of your recollection?

A: I couldn't tell you, I really couldn't.

Q: You say you saw no one pull the trigger, but do you know who did the shooting?

A: I didn't see nobody pull the trigger, but this is true. The only person in the house, like I told you, everybody that was in the house, and the only other person in the house was Benny. So, as far as bringing the accusation against anyone, then you will have to come to the conclusion yourself. I didn't see nobody pull it, and I'll tell you the same way I told when my other brothers got shot, I will not tell a lie, but I will not make accusations, either.

Q: O.k., thank you very much.

J.A. at 214-17.

the dismissal of the seven procedurally defaulted claims, but we remanded the case for a hearing to determine whether Jones could "make out a Fifth Amendment due process violation" "as it relates to the delay between issuance of the warrant and his arrest." Jones v. People of the Commonwealth of Virginia, No. 92-6989, 1993 WL 62079, at *2 (4th Cir. Mar. 8, 1993). On remand, a hearing was held before a magistrate judge. The district court, over objections from both parties, adopted most, but not all, of the magistrate's report, concluding that Jones had failed to "meet his burden to show actual prejudice" and that "the evidence adduced at the hearing clearly showed that petitioner was at least as blameworthy for the delay as respondent." J.A. at 13-14. The district court dismissed Jones' petition for a writ of habeas corpus, and this appeal followed.

II.

We have previously held that, in determining whether pre-indictment delay violates the Fifth Amendment's Due Process Clause, the following analysis is to be applied:

> [T]he burden [is] on the defendant to prove actual prejudice. Assuming the defendant can establish actual prejudice, then the court must balance the defendant's prejudice against the government's justification for delay. "The basic inquiry then becomes whether the government's action in prosecuting after substantial delay violates `fundamental conceptions of justice' or `the community's sense of fair play and decency.'"

Howell v. Barker, 904 F.2d 889, 895 (4th Cir.) (quoting United States v. Automated Med. Lab., 770 F.2d 399, 404 (4th Cir. 1985)), cert. denied, 498 U.S. 1016 (1990).

A.

The Commonwealth first contends that we should overrule Howell because it is irreconcilable with a number of Supreme Court cases, including United States v. Gouveia, 467 U.S. 180, 192 (1984), in which then-Justice Rehnquist, writing for the Court, explained that in

9

order to establish a due process violation based upon pre-indictment delay, a defendant must show not only actual prejudice, but also that the government deliberately caused the delay for tactical gain:

> [T]he Fifth Amendment [due process guarantee] requires the dismissal of an indictment, even if it is brought within the statute of limitations, if <u>the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and</u> that it caused him actual prejudice in presenting his defense.

<u>Id</u>. (emphasis added); <u>see also United States</u> v. <u>Marion</u>, 404 U.S. 307, 324 (1971) ("[T]he [Due Process Clause] would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' right to a fair trial <u>and</u> that the delay was an intentional device to gain tactical advantage over the accused." (emphasis added)); <u>cf</u>. <u>United States</u> v. <u>Lovasco</u>, 431 U.S. 783, 795 (1977) ("[I]nvestigative delay is fundamentally unlike delay undertaken by the Government solely `to gain tactical advantage over the accused.'" (quoting <u>Marion</u>, 404 U.S. at 324)); <u>Arizona</u> v. <u>Youngblood</u>, 488 U.S. 51, 58 (1988) ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").**5**

On the authority of <u>Gouveia</u>, <u>Marion</u>, <u>Lovasco</u>, and <u>Youngblood</u>, every circuit, other than our own and the Ninth Circuit, has indeed held that, in order to establish that a lengthy pre-indictment delay rises to the level of a due process violation, a defendant must show not only actual substantial prejudice, but also that"the government intentionally delayed the indictment to gain an unfair tactical advan-

_____

**5** <u>See also Youngblood</u>, 488 U.S. at 57 ("Our decisions in related areas <u>have stressed the importance for constitutional purposes of good or bad faith on the part of the Government</u> when the claim is based on loss of evidence attributable to the Government. In <u>United States</u> v. <u>Marion</u>, 404 U.S. 307 (1971), we said that `[n]o actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them.'" (emphasis added)).

10

tage or for other bad faith motives." United States v. Crooks, 766 F.2d 7, 11 (1st Cir.) (Breyer, J.) (internal quotation marks omitted), cert. denied, 474 U.S. 996 (1985); see also, e.g., United States v. Lebron-Gonzalez, 816 F.2d 823, 831 (1st Cir.), cert. denied, 484 U.S. 843 (1987); United States v. Hoo, 825 F.2d 667, 671 (2d Cir. 1987), cert. denied, 484 U.S. 1035 (1988); United States v. Ismaili, 828 F.2d 153, 167 (3d Cir. 1987), cert. denied, 485 U.S. 935 (1988); United States v. Crouch, 84 F.3d 1497 (5th Cir. 1996) (en banc); United States v. Brown, 959 F.2d 63, 66 (6th Cir. 1992); United States v. Sowa, 34 F.3d 447, 450 (7th Cir. 1994), cert. denied, 115 S. Ct. 915 (1995); United States v. Stierwalt, 16 F.3d 282, 285 (8th Cir. 1994); United States v. Engstrom, 965 F.2d 836, 839 (10th Cir. 1992); United States v. Hayes, 40 F.3d 362, 365 (11th Cir. 1994), cert. denied, 116 S. Ct. 62 (1995); Howell, 904 F.2d at 902-03 (Russell, J., dissenting). Because Jones has presented no evidence whatsoever that the Commonwealth delayed arresting or indicting him for tactical advantage or that Virginia otherwise acted in bad faith, he could not possibly establish a due process violation under this standard.

But, as the Commonwealth is aware, we cannot, as a panel of the court, overrule the decision of another panel; only the en banc court may overrule a prior panel decision. As we discuss below, however, Jones has failed to establish a due process violation even under the more lenient Howell standard applicable in this circuit.

B.

Howell, like Gouveia, first requires that we determine if pre-indictment delay has caused the defendant actual prejudice. Howell, 904 F.2d at 895. The district court concluded that Jones had not satisfied this requirement of Howell because he failed to demonstrate that any witness he might have called would have provided him an alibi for the murders, that is, that any witness would have testified that he was with Jones, or that he saw Jones, in New York City on the day Jones' mother and half-brother were murdered in Virginia and at a time that would have foreclosed the possibility of Jones' presence in Virginia when the murders occurred.

Jones advances two arguments as to why, in his belief, the district court erred in this conclusion. First, Jones contends that, because of

11

the length of delay in this case, he should be relieved of his burden of proving actual substantial prejudice. Second, and alternatively, Jones contends that he has made a sufficient showing of actual prejudice to satisfy Howell and therefore to establish a due process violation. We consider each argument in turn.

1.

Jones first alleges that the length of the pre-indictment delay in this case "constitutes a prima facie showing of actual prejudice," and shifts to the Commonwealth the burden of proving that Jones did not suffer prejudice from the delay. Appellant's Br. at 21. The Due Process Clause has never been interpreted so as to impose a presumption of prejudice in the event of lengthy pre-indictment delay, as Jones himself acknowledges. He maintains, however, that the Supreme Court's holding in Doggett v. United States, 505 U.S. 647, 655 (1992), that a lengthy post-indictment delay is presumptively prejudicial to the defendant for purposes of establishing a Sixth Amendment speedy trial claim, should be extended to pre-indictment delays which potentially give rise to claims under the Fifth Amendment Due Process Clause. Because a rule of presumptive prejudice in this latter context would be at odds with established Supreme Court authority, we decline appellant's invitation to so extend Doggett.**6**

The Supreme Court has repeatedly emphasized that, in order to establish a due process violation, the defendant must show that the delay "caused him actual prejudice in presenting his defense." Gouveia, 467 U.S. at 192 (emphasis added); see also Lovasco, 431 U.S. at 789 ("[P]roof of actual prejudice makes a due process claim concrete and ripe for adjudication, not . . . automatically valid."); Marion, 404 U.S. at 326 ("Events of trial may demonstrate actual

_____

**6** The speedy trial right does not apply to Jones' pre-indictment delay because that right does not attach until the defendant has been indicted or arrested. See, e.g., Doggett, 505 U.S. at 655 ("Sixth Amendment right of the accused to a speedy trial has no application beyond the confines of a formal criminal prosecution."); Marion, 404 U.S. at 313, 321 ("[W]e decline to extend the reach of the [Sixth][A]mendment to the period prior to arrest."); see also United States v. Thomas, 55 F.3d 144, 148 (4th Cir. 1995).

12

prejudice, but at the present time appellees' due process claims are speculative and premature."). Indeed, the Court in Marion specifically rejected the argument that the "potential prejudice and passage of time" is sufficient to sustain a due process claim. 404 U.S. at 323. As Justice White explained for the Court in that case:

> The law has provided other mechanisms to guard against possible as distinguished from actual prejudice resulting from the passage of time between crime and arrest or charge. As we said in United States v. Ewell, [383 U.S. 116, 120 (1966)] `the applicable statute of limitations . . . is . . . the primary guarantee against bringing overly stale criminal charges.' Such statutes represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice; they `are made for the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defence.' Public Schools v. Walker, 9 Wall. 282, 288[(1870)]. These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.

Marion, 404 U.S. at 322; see also Lovasco, 431 U.S. at 789 (quoting Ewell and Marion). The narrow application of the Due Process Clause in the context of pre-indictment delay was reaffirmed some six years later in Lovasco. 431 U.S. at 789 ("[T]he Due Process Clause has a limited role to play in protecting against oppressive delay.").

Following these precedents from the Supreme Court, the courts of appeals have uniformly held that to obtain a dismissal under the Due Process Clause a defendant must establish that a pre-indictment delay actually prejudiced his defense, see, e.g., cases cited supra at pp. 9-10; Howell, 904 F.2d at 895 ("[T]he burden [is] on the defendant to prove actual prejudice." (emphasis added)); Crouch, 84 F.3d at 1511-12 (collecting cases); Stoner v. Graddick, 751 F.2d 1535, 1544 (11th Cir. 1985); United States v. Marler, 756 F.2d 206, 213 (1st Cir. 1985), as we had held as early as 1970:

> The law is clear that a mere showing of delay in indictment and arrest is not sufficient to show a [due process] violation,

13

> that prejudice will not be presumed from mere delay, and
> that a defendant must bear the burden of proving prejudice
> by a pre-indictment delay.

United States v. Baker, 424 F.2d 968, 970 (4th Cir. 1970). The Seventh Circuit, for example, recently held that, notwithstanding a 16-year prosecutorial delay between the commission of the crime and the indictment, the defendant "must demonstrate that he suffered actual and substantial prejudice," expressly rejecting the contention that delay alone constitutes sufficient prejudice to support a due process violation. Wilson v. McCaughtry, 994 F.2d 1228, 1234 (7th Cir. 1993); see also Graddick, 751 F.2d at 1543-45 (holding that a 19-year pre-indictment delay was not presumptively prejudicial); United States v. Bracy, 67 F.3d 1421, 1427 (9th Cir. 1995) ("The defendants' proof of prejudice must be definite and not speculative." (internal quotation marks omitted)); Crouch, 84 F.3d at 1523 (holding that the "requisite prejudice [from a pre-indictment delay] may not be presumed, rebuttably or otherwise, merely from the length of the delay"). Moreover, to our knowledge, every court that has specifically considered the application of Doggett in the context of an alleged due process violation has held that "[t]he concept of presumed prejudice has no place in a due process analysis." United States v. Beszborn, 21 F.3d 62, 66-67 (5th Cir. 1994); see also Crouch, 84 F.3d at 1515 & n.26; United States v. Bischel, 61 F.3d 1429, 1436 (9th Cir. 1995).**7**

We therefore reaffirm our earlier decisions that in order to maintain a due process claim the defendant must show actual prejudice. For purposes of the Due Process Clause, as long as the indictment is brought within the statute of limitations, we will not presume that the defendant has been prejudiced by delay between commission of the offense and arrest or indictment. It is incumbent upon the defendant, if he is to prevail upon such a claim, to establish that he has been so prejudiced.

_____

**7** Jones' reliance upon Pitts v. North Carolina, 395 F.2d 182, 185 (4th Cir. 1968), where we held that a 16-year pre-indictment delay was presumptively prejudicial for purposes of the right to a speedy trial under the Sixth Amendment, is misplaced, given Marion's holding that the Sixth Amendment right to a speedy trial does not attach until the defendant has been indicted or arrested. See 404 U.S. at 313, 320-21.

14

2.

Jones next contends that, even if he is not entitled to a presumption of prejudice, he has nonetheless carried his burden of proving actual substantial prejudice. This is a heavy burden because it requires not only that a defendant show actual prejudice, as opposed to mere speculative prejudice, see, e.g., Marion, 404 U.S. at 325-26; Lovasco, 431 U.S. at 789-90, but also that he show that any actual prejudice was substantial -- that he was meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceeding was likely affected. See, e.g., Marion, 404 U.S. at 324 ("substantial prejudice"); Couch, 84 F.3d at 1511-12, 1515 (collecting cases); Brown, 959 F.2d at 66; Sowa, 34 F.3d at 450; Graddick, 751 F.2d at 1547 (holding that a showing of actual substantial prejudice requires a "reasonable probability" that absent the delay "the result of the proceeding would have been different"); Wilson, 994 F.2d at 1234; United States v. Bartlett, 794 F.2d 1285, 1290 (8th Cir.), cert. denied, 479 U.S. 934 (1986) ("[D]efendant must demonstrate that the prejudice actually impaired his ability to meaningfully present a defense.").

When the claimed prejudice is the unavailability of witnesses, as here, courts have generally required that the defendant identify the witness he would have called; demonstrate, with specificity, the expected content of that witness' testimony; establish to the court's satisfaction that he has made serious attempts to locate the witness; and, finally, show that the information the witness would have provided was not available from other sources. See, e.g., Howell, 904 F.2d at 893; Crouch, 84 F.3d at 1515; United States v. Brown, 742 F.2d 359, 362 (7th Cir. 1984); United States v. Kidd, 734 F.2d 409, 413 (9th Cir. 1984).

Jones' only contention is that, because of the delay preceding his indictment in this case, he was unable to call witnesses who could have testified that he lived at the Elk Hotel in New York continuously from December 1974 until April 1975,**8** J.A. at 17, 69-72; he does not

_____

**8** Jones also contends that he suffered prejudice because the Elk Hotel has since destroyed its records, and therefore that potentially exculpatory evidence that could have shown that "Jones was residing at the hotel on

15

contend that he was unable to call witnesses who would have testified that he was in New York on the day of the murders of his mother and half-brother. In support of his contention, Jones identified four residents and a few clerks with whom he claimed he had become acquainted while living at the Elk Hotel. When his attorneys searched for these witnesses, however, they found only one, a clerk at the hotel. That clerk could not remember Jones, although he did vaguely remember that someone fitting Jones' description had lived at the hotel in the past, as the magistrate found. See J.A. at 17 (finding by magistrate that counsel for Jones "was unable to refresh [the clerk's] memory with either recent or older photographs of Jones").

The district court held that Jones had not shown that any of his alleged witnesses would have provided him an alibi for the date of the murders, J.A. at 17-18, 22-23, finding that "[a]t best, [Jones] has stated that [these witnesses] could have verified that he was living at the Elk Hotel during the relevant period of time," not that he was "physically in New York City when the Wise County murders occurred." J.A. at 24 (emphasis added). Additionally, the district court held that Jones had failed to show that the testimony which he claims these witnesses would have provided could not have been provided by other witnesses. J.A. at 24 ("Another aspect of Jones' failure to show actual prejudice is that he never indicated that these witnesses from the Elk Hotel were the only people in New York City that he knew."). See infra note 6.

Jones has never claimed, and does not claim before this court, that any of his acquaintances at the Elk Hotel actually saw him in New York on January 8, 1975, or, importantly, even that he saw any of

_____

January 8, 1975" was unavailable. Appellant's Br. at 25 (emphasis added). This argument is meritless. First, as found by the district court, Jones admitted that he had hotel receipts at the time of his murder trial; thus, the hotel records were unnecessary to establish that he lived at the Elk Hotel. J.A. at 18, 22, 66, 73-74. Second, both the receipts and the records would have shown at most that Jones rented a room at the Elk Hotel from December until April, not that he was actually in his room on January 8. See J.A. at 22 (Magistrate's Report) (finding that the hotel records "would not have established his actual physical presence in New York on the day of the murders").

16

these individuals.**9** Nor does he offer any particular reason why these individuals -- who, it must be remembered, were not Jones' friends but rather merely persons he might have passed as he entered or departed the hotel -- might have remembered seeing Jones on the specific date in question, much less remembered seeing him within the hours of that day in which they would have had to see him in order to serve as alibis. In the magistrate's words:

> Jones never testified as to any specific facts or events which would have caused these witnesses to know that he was in New York on January 8, 1975, as opposed to any other day in that month. Jones has not even told the court what he expected these witnesses to have known.

J.A. at 24; see also J.A. at 17-18 (finding of fact) ("There was no testimony at the evidentiary hearing as to what these witnesses would have specifically said had they been located prior to trial.").

_____

**9** That Jones does not even claim to have seen any particular person whom he might have called as a witness to his whereabouts on the day in question is especially significant, we believe, given that he was able to describe with remarkable specificity exactly what he was doing on January 8, 1975, the day his mother and brother were murdered. In a sworn affidavit, Jones stated:

> On January 8, 1975, I was in New York City, residing at the Elk Hotel, 360 West 42nd St. On that day, I did not have any work to do, so I returned to my hotel as I usually do. Later I went to the OTB as I usually do when I'm not working. I placed my bets and then went back to my hotel to wait until it was time to go back to OTB to check on them and go to the gymn[sic]. At the time, I was working at the day labor agency on or near Fulton Street. The gymn [sic] was below 14th Street.

J.A. at 248. We likewise believe that Jones' affidavit statements confirm the correctness of the district court's companion conclusion that Jones failed to prove the uniqueness of the testimony which he claims he lost because of the pre-indictment delay. It is quite obvious from the above-quoted affidavit passage (if Jones is to be believed) that Jones encountered numerous persons in New York City on the day of the murders who presumably were in far better positions to serve as alibis than any of his alleged acquaintances at the Elk Hotel. Yet, none of these persons does Jones suggest he would have called as witnesses.

17

As the district court held, testimony that Jones lived at the Elk Hotel in New York from December 1974 until April 1975 obviously does not in any way exculpate, or even tend to exculpate, Jones for an offense committed on a particular day and at a particular time during that period. Even if the witnesses Jones identified could have testified that they regularly encountered Jones during that time period, they would not have represented alibi witnesses for Jones, unless they remembered seeing Jones on the specific day in question and at a particular time of that day, which, because of Jones' tenuous connections with the alleged witnesses, would be highly unusual even a few days after January 8, 1975. Cf. Bracy, 67 F.3d at 1427 ("`emphasiz[ing] that protection of lost testimony generally falls solely within the ambit of the statute of limitations'" and questioning "whether lost testimony due to dimmed memories could ever be sufficiently prejudicial so as to violate due process") (citations omitted); Brown, 742 F.2d at 362 ("`Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice' stemming from preindictment delay." (quoting United States v. Jenkins, 701 F.2d 850, 855 (10th Cir. 1983)). Indeed, counsel for Jones all but conceded at oral argument that Jones failed to carry his burden of showing actual prejudice, when she admitted that Jones' showing was "wanting in terms of an alibi defense" (although arguing that it was sufficient because of the lengthy delay). Oral Argument, June 6, 1996.

Because Jones did not establish (or, for that matter, even allege) that acquaintances from the Elk Hotel would have testified that they saw Jones in New York on January 8, 1975, nor why they might have remembered seeing him on that particular day, he has failed to convince us that the district court's factual findings were clearly erroneous, or, ultimately, that he was prejudiced at all by the delay between his commission of the crime and his indictment.**10**

_____

**10** Jones nevertheless contends that his burden of proving actual substantial prejudice should be reduced in this particular case because of the weakness of the state's case against him. In Jones' opinion, the Commonwealth's case against him was weak because it was comprised largely of his siblings' eye-witness accounts of him murdering his mother and half-brother. To the extent that the strength of the state's case is at all relevant to the due process inquiry, it is only relevant in consider-

C.

Even if Jones had established that he was actually and substantially prejudiced by the pre-indictment delay, he still would not be entitled to relief under the Due Process Clause, because he has also failed to satisfy Howell's second requirement that, balancing the prejudice to the defendant against the state's reasons for the delay, the delay "violate[d] fundamental conceptions of justice or the community's sense of fair play and decency." Howell, 904 F.2d at 895.

The Commonwealth of Virginia has a compelling explanation for the delay: Jones opposed extradition at every juncture and the State of New York repeatedly rebuffed Virginia's attempts to obtain Jones. See, e.g., J.A. at 18-19, 45, 47, 48, 114, 130, 148, 151. As the district court found, "the evidence adduced at the hearing clearly showed that petitioner was at least as blameworthy for the delay as respondent." J.A. at 14; see also Jones v. Commonwealth, No. 1499-87-3 (Va. Ct. App. Dec. 6, 1988) (holding that the delay was "of [Jones'] own making").

In fact, it is more than a little ironic that Jones now complains of an excessive pre-indictment delay, considering the evidence that he opposed extradition or return to Virginia by other means, J.A. at 45, 47-48, 114; Supp. J.A. at 2-5, even intentionally violating prison rules in an apparent attempt to delay his parole and thus his return to the Commonwealth for indictment and prosecution, J.A. at 19-20, 109-10, 112, 122, 130-31. We need not recount from our discussion supra Virginia's numerous attempts to obtain custody of Jones following his

———————————————————————————————

ing whether the actual prejudice established by the defendant is substantial. Cf. Bartlett, 794 F.2d at 1292; Wilson, 994 F.2d at 1234. The strength of the state's case is irrelevant to the question of whether the defendant has suffered actual prejudice. Since Jones has failed to establish actual prejudice, we need not examine the proof offered by the state during Jones' criminal prosecution. We do, however, disagree with Jones' characterization of the state's case as "weak." We believe that the state's case, based as it was primarily upon eye-witness accounts of the murders by family members who had, in our opinion, nothing whatever to gain by falsely incriminating Jones, was anything but "weak."

19

arrival in New York. Suffice it to say, however, that, as noted, Virginia made repeated good faith efforts to immediately secure Jones' presence in Virginia, including, as Jones' own oral and written testimony confirms, the pursuit of proceedings in the New York Supreme Court in July 1975, shortly after Jones was first captured,[11] and proceedings in 1982 and 1985. See J.A. at 18-20 (findings of fact); Supp. J.A. at 2, 4; J.A. at 57; see also discussion supra at pp. 3-4. And, as Jones himself admits, "[e]ach and every time they took [him] to Court [he] requested a hearing," J.A. at 48, he refused to sign extradition papers, J.A. at 47, and he filed a writ of habeas corpus to prevent New York from extraditing him to Virginia, Supp. J.A. at 2-5.

Jones' counsel herself reluctantly conceded at argument that Jones' claim reduces to one that Virginia should have made additional efforts to secure his presence in Virginia in the face of New York's refusal to grant Virginia temporary custody in 1975. That the Commonwealth could have done more to attempt to gain custody over Jones, however, is not the inquiry. The state is not required by the Due Process Clause to employ every single means available to it to secure the presence of a resisting fugitive, lest it forfeit its rights of indictment and prosecution. And the Due Process Clause certainly does not demand that a state consume its limited resources through repeated efforts to gain custody over fugitives incarcerated in other states, after good faith efforts prove fruitless, especially where that state is continually met with resistance from the holding state and the fugitive himself.

_____

[11] Jones is now at pains to argue that nothing "conclusively" proves that extradition proceedings were actually commenced in 1975, see, e.g., Appellant's Br. at 6, 30 n.20. He notes in this regard that in a formal application for extradition filed in 1982, a Virginia official said that "[n]o other application" for extradition had been made out for Jones. See J.A. at 159. However, Jones himself repeatedly termed the 1975 proceedings "extradition proceedings" and he affirmed under oath that both the court and the Governor of New York refused to allow Virginia to take temporary custody of Jones. J.A. at 57; Supp. J.A. at 2, 4. Even if there were no formal extradition proceedings, the record is uncontroverted, and the district court's factual finding unassailable, that there was some proceeding in New York in 1975 at which Virginia attempted, albeit unsuccessfully, to obtain custody of Jones.

20

The contrast between this case and the cases upon which Jones principally relies is stark, indeed. Although, in <u>Howell</u>, we granted petitioner <u>habeas</u> relief because of an unconstitutional pre-indictment delay, counsel for the state there admitted that North Carolina had done nothing to gain custody over the defendant, and that the indictment was delayed for the "mere convenience" of the local officials. 904 F.2d at 895. Likewise, in <u>Pitts</u>, the state had "made no effort of any kind" to obtain the suspect and "fail[ed] to take even the slightest step to procure a temporary release and a prompt hearing" during the fifteen years preceding indictment. <u>Pitts</u>, 395 F.2d at 187. Here, Virginia acted with more than reasonable diligence in making prompt and repeated efforts to obtain Jones.

Given the complete lack of prejudice to Jones, Virginia's prosecution of Jones after the pre-indictment delay most assuredly did <u>not</u> "violate[ ] fundamental conceptions of justice or the community's sense of fair play and decency." <u>Howell</u>, 904 F.2d at 895 (internal quotation marks omitted). If anything, in light of the Commonwealth's efforts to obtain custody over Jones, the community's sense of justice and fairness would be offended if Virginia were to be prohibited from indicting and prosecuting Jones for the murders of his mother and half-brother.

Accordingly, the judgment of the district court dismissing Jones' petition for writ of <u>habeas corpus</u> is affirmed.

<u>AFFIRMED</u>

MURNAGHAN, Circuit Judge, concurring:

I concur in the judgment, however, I write separately in order to clarify what the record establishes as fact and what is speculation or questionable inference in the majority opinion. As the ends sometimes do not justify the means, so too a proper result may proceed from an unjustified method. The case concerns unsatisfactory conduct by both the Virginia prosecutor on the one hand and the defendant on the other. Our conclusion that the defendant has not shown prejudice and is therefore not entitled to relief, however, should not be converted into a justification or excuse for the negligent behavior of the prosecutors.

21

I

The following is what the record establishes. On January 8, 1975, Marie Gladys Jones and William Anthony Hall were murdered at their home in Wise County, Virginia. J.A. 16. On the day of the murders, the Wise County Sheriff's Office obtained an arrest warrant for Benjamin Jones, the son and half-brother of the victims. J.A. 251-52. Shortly thereafter, those officials learned that Jones was in New York. J.A. 168. When they located Jones in New York in March 1975, he was being held by New York on an unrelated robbery charge. J.A. 16, 117-18, 167. Subsequently, New York tried and convicted Jones of robbery and sentenced him to seven and one-half to fifteen years imprisonment. J.A. 16, 42, 164. As a result of his New York sentence, Jones was not indicted for the murders nor brought to Virginia for trial until 1986. What occurred in the interim follows.

A. 1975

In March 1975, an official from the Commonwealth of Virginia sent a letter to the New York City Police Department asking it to inform the Virginia officials if Jones, whom they referred to "as being held by" the New York City Police Department, refused to waive extradition. J.A. 167. If not, the official indicated that the Commonwealth's Attorney would begin extradition proceedings. The letter enclosed two warrants to be filed as detainers. J.A. 18, 109, 167.

The record does not clearly reflect, however, whether extradition proceedings were initiated in 1975. J.A. 18-19, 146-68. At one point in 1975 Jones appeared in a local New York court where he was informed that two Assistant Attorney Generals from Richmond, Virginia were there with warrants charging him with two murders and that they were trying to extradite him. J.A. 54-57. Jones testified that he did not appear in court, and that he understood that the judge dismissed the complaints and warrants. J.A. 18-19, 43-44, 54-57. There is no documentation of the hearing in the record. Jones in a 1985 habeas corpus application stated that: "extradition proceedings were held . . . in 1975," but then dismissed. Supp. J.A. 4. In a 1982 extradition application, the Commonwealth, however, stated that "[n]o other application has been made for a requisition for the said fugitive." J.A. 159. And the Commonwealth stipulated at the habeas hearing that

22

other than the letter sent to the New York Police Department in 1975 attaching two detainers, its file did not contain a record of any activity to extradite or obtain custody of Jones through other means prior to 1982. J.A. 124-25. No other activity concerning gaining custody of Jones occurred in 1975.

B. <u>1982</u>

The record reflects that Virginia failed to take any further action after 1975 to secure temporary custody of Jones for trial until 1982. J.A. 18, 124. So, from 1975 to 1982 Virginia's wish to prosecute Jones was not pursued. Having "lost track" of its key witness, Jones's sister, the Commonwealth presumably had little motivation to seek Jones's extradition.[1] In 1982, however, the prosecuting Assistant Commonwealth's Attorney chanced across the missing witness's name in a legal notice in a condemnation case, located the witness, and came to understand that Jones was scheduled to be released from New York prison in August or September of 1982. J.A. 19, 108, 158, 160, 165. At that point in time, the Assistant Commonwealth's Attorney initiated procedures in order to obtain custody of Jones. J.A. 19, 158-165. That is the first time that the Commonwealth's case file reflects any efforts were made to obtain custody of Jones other than the initial letter sent in 1975 prior to Jones's trial in New York for robbery.

_____

[1] The majority states that Virginia "understandably lost contact" with the witness because of New York's initial refusal in 1975 to allow Virginia temporary custody of Jones. As previously explained, the record does not reflect exactly what occurred in 1975. While it appears that two individuals traveled to New York, it is unclear whether an extradition proceeding actually occurred. Jones testified that he never appeared in court. It is certainly not evident in the record that New York refused to extradite Jones. There was no proof of such refusal. Nor was there any proof that Virginia actually sought extradition. Furthermore, the record does not reflect an effort on the part of the Commonwealth to keep in touch with the witness (Jones's sister), to keep a current address of the witness, or to maintain any information on the key witness in the case against Jones. Most significantly, the record does not reflect any further efforts whatsoever by the Commonwealth to extradite Jones after the initial 1975 letter was sent until its Assistant Commonwealth's Attorney years later happened upon the witness.

23

The Assistant Commonwealth's Attorney wrote to the superintendent of the New York prison in which Jones resided requesting temporary custody pursuant to the Interstate Detainer Agreement. J.A. 19, 163-165. Additionally, in 1982, the prosecuting Assistant Commonwealth's Attorney wrote to the Virginia Governor seeking extradition. J.A. 19, 158. There are no records, however, of any action taken by the Governor on the petition or of any follow-up by the Attorney on the request. Jones's testimony indicates that a hearing began in 1982 in New York relating to the Virginia charges. J.A. 19, 44-45. It is unclear what occurred at that hearing because Jones had to be removed from the courtroom due to his misbehavior.

Jones was not released as scheduled in 1982 because he violated prison rules. J.A. 109-10, 122, 130-31. The majority suggests that Jones violated prison rules in order to delay his release and return to Virginia for trial. That suggestion is based only, however, on speculation--the Assistant Commonwealth's Attorney's memory of phone calls--some from over a decade ago--with unnamed New York prison officials who, the Attorney asserts, stated that Jones violated prison rules to avoid being paroled.[2]

_____

[2] The evidence relied upon is the Assistant Commonwealth's Attorney's memories of telephone calls he had with New York prison officials who in turn were speculating on Jones's motives for violating the rules. The very same Assistant Commonwealth's Attorney had some difficulty remembering facts of the case and referred the questioner to what was established in the case file. J.A. 120-24. For example, he responded to the following question:

> Q. You sent a detainer up and said, "Don't turn him loose," but did you do anything else to get him back down here? Did you p[ursue] any other routes until 1982?
>
> A. Well, whatever the records show, I am sure we just didn't sit and wait. Telephone communications and whatnot, they would say "We will let you know when he is coming up for release," and then every time we would get ready, I would have the deputies line up to go up there, they would call back and say, "Hold it. He has violated the rules intentionally, because he doesn't want to go back to Virginia."

J.A. 122 (emphasis added). The Commonwealth case record did not reflect any of the telephone communications referenced. Reliance on record testimony that is based on speculation in some instances and hearsay in others is speculation. J.A. 109-10, 122, 130.

24

C. <u>1985</u>

The record reflects no further activity by Virginia until 1985. J.A. 19-20. In 1984, New York had written Virginia to inform it of Jones's upcoming release in March 1985. J.A. 19, 157. Virginia responded by informing New York that it would seek extradition upon release if Jones refused to waive it. J.A. 156. Jones, however, was not released in March 1985. Later that spring and summer, Virginia initiated efforts to obtain custody over Jones. J.A. 146-55. Finally, in January 1986, New York released Jones from jail. J.A. 48. Virginia transferred Jones to Virginia, indicted him, and approximately one year later in 1987 tried him for murder. J.A. 48-49, 250.

The record reflects that Jones opposed Virginia's efforts to gain temporary custody of him when those efforts were initiated in 1982 and thereafter. J.A. 44-45, 47, 50-51, 114. One after all can make an effort, even a losing one, to succeed in a legal process. However, absolutely nothing in the record reflects any activity by Jones opposing any such efforts before 1982.

The majority also suggests that "apparently" New York refused to release Jones because it feared that he would be subjected to the death penalty in Virginia and requested assurances that Jones was not eligible for capital punishment. J.A. 129-30. However, the Assistant Commonwealth's Attorney testified that no governor of New York refused to transfer Jones prior to 1985.[3] J.A. 134. And, there is no record in

_____

**3** He states:

> Q. Now, you said the Governor made you sign that you wouldn't ask for the death penalty when you brought him back. Which Governor was that in New York?
>
> A. I don't remember his name.
>
> Q. Was that the Governor who was Governor in 1985 through 1986?
>
> A. Yes, it would be something from whoever was in office then, and I don't have any idea.
>
> Q. Now, did any other Governor ever refuse to send him back from New York?

25

the Commonwealth's file of a refusal of extradition by a New York Governor.**4**

D. <u>1987--Trial</u>

In 1987, approximately twelve years after the murders occurred and twelve years after Virginia knew where Jones was located, the Commonwealth prosecuted Jones for the murder of his mother and half-brother. The thrust of the Commonwealth's case against Jones was the eye-witness testimony of his sister.**5**

Jones contended throughout trial that he had been in New York during the time of the murders. Jones's attorneys attempted to locate

_____

      A. Not that I know of, no.

J.A. 134. Thus, in any event, the excuse offered only applies to the very end of the extraordinary delay at issue and is, therefore, not a sufficient excuse at all.

**4** Only on October 28, 1985, the same month New York paroled Jones to Virginia's custody, did the Assistant Commonwealth's Attorney write to New York to explain that Jones was not legally eligible for capital punishment. J.A. 20, Supp. J.A. 1. The only other evidence of New York's position is testimony by the Assistant Commonwealth's Attorney --the very same attorney who had some difficulty remembering details of the case and referred the questioner to the record. J.A. 118-24. The record was entirely silent as to New York's position, with the exception of the October 1985 letter.

My disagreement with the majority, however, is irrelevant to my ultimate point. If indeed New York's "apparent" fear of the death penalty was the alleged reason New York refused to extradite Jones prior to 1985, then it could have been easily cured well before 1985 because Jones was ineligible for the death penalty.

**5** While, as the majority states, two siblings testified at trial, in fact only one gave an eye-witness account of Jones committing the murders. The majority has criticized my clarification that two witnesses did not give eye-witness testimony of the murder. As the majority's footnote four reveals, however, the brother did not testify that he <u>saw</u> (<u>i.e.</u>, witness with his eyes) Benjamin Jones pull the trigger. Thus it is inaccurate of the majority to say that two siblings gave <u>eye</u>-witness testimony.

26

the witnesses Jones named with specificity and the hotel records of the hotel where Jones claims he was staying at the time of the murders. J.A. 69-72, 95, 249. The attorneys traveled to New York and found the hotel. They spoke with the hotel clerk whom Jones had remembered, Teddy Black. Black thought he remembered Jones, but was unsure and not able to identify a photograph of Jones from 1986. J.A. 82-83, 96-97. Black recognized the other names or descriptions Jones had given the attorneys, but those individuals had all left the hotel and their whereabouts were unknown. J.A. 83, 85. The hotel records from 1975 were not available because records were routinely destroyed. J.A. 84. All other investigation failed to lead to any further information.

II

With respect to the extraordinary delay, the record reflects that the 1975 efforts were fragmentary and that there were no efforts from 1975 to 1982 by Virginia to obtain custody of Jones, and the prosecution advances no explanation or excuse for the delay.[6] The reasons for the delay are not clear. However, as the Magistrate Judge, who conducted the factfinding in this case opined, it appears that "the primary reason was neglect by Wise County officials." J.A. 26.[7] In light of the

_____

[6] The Commonwealth of Virginia had at its disposal three different methods for obtaining temporary custody of Jones in order to try him. First, a state may obtain temporary custody through the Interstate Agreement on Detainers. Va. Code Ann. §§ 53.1-210 through 53.1.-215 (Michie 1994). Second, the Uniform Criminal Extradition Act allows a state to secure temporary custody over another state's prisoner in order to try him or her. Va. Code Ann. §§ 19.2-85 through 19.2-118 (Michie 1995). Finally, Virginia could have sought a writ of habeas corpus ad prosequendum. While such writs are normally used by federal courts to gain custody of individuals in state custody, state courts may issue the writs to other states. See, e.g., Steward v. Bailey, 7 F.3d 384, 386 (4th Cir. 1993).

[7] While the district court found that the evidence demonstrated that Jones was "at least as blameworthy for the delay" as the Commonwealth, the evidence only showed that for the period following 1982. J.A. 14. Prior to 1982, there is no evidence that Jones was responsible for the delay. Indeed, the evidence reflects that the Commonwealth failed to act at all during the vast majority of the delay--the period between 1975 and 1982.

27

unexplained extraordinary delay attributable to Virginia prosecutors and the evidence at trial, if Jones could demonstrate actual prejudice, under Howell v. Barker, 904 F.2d 889 (4th Cir), cert. denied, 498 U.S. 1016 (1990), he would be entitled to a dismissal of the indictment.[8]

Jones, however, failed to demonstrate actual prejudice. Jones named several potential witnesses who lived in the same hotel where he claims he was on the day of the murder, and he raised the absence

of the hotel's records as prejudicial to his defense.[9] Jones failed, however, to demonstrate what the missing witnesses would have testified to or what the missing documents would have shown that would have been exculpatory. Jones also failed to demonstrate that there were no other witnesses or documents that could establish the same objective.

Actual prejudice must be demonstrated with more than mere speculation. Thus, I concur in the judgment, though I believe it overstates the factual basis which supports it.

_____

[8] The delay was so extraordinary that the district court found that it verged on "actual prejudice per se." J.A. 13.

[9] As explained previously, all but one of the witnesses Jones named had disappeared in the long delay. And that one witness suffered from a faded memory due to the passage of time. All hotel records had been destroyed as the result of regular document destruction.

28