**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LANE HOLLOW COAL COMPANY; OLD
REPUBLIC INSURANCE COMPANY,
Petitioners,

v.

DIRECTOR, OFFICE OF WORKERS'

No. 96-2819

COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR;
PAULINE LOCKHART, Widow of
Woodrow Lockhart,
Respondents.

On Petition for Review of an Order
of the Benefits Review Board.
(94-3953-BLA)

Argued: June 6, 1997

Decided: March 3, 1998

Before WILKINSON, Chief Judge, MICHAEL, Circuit Judge,
and MICHAEL, Senior United States District Judge
for the Western District of Virginia,
sitting by designation.

_____

Affirmed in part and vacated in part by published opinion. Judge
Michael wrote the opinion, in which Chief Judge Wilkinson and
Senior Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Mark Elliott Solomons, ARTER & HADDEN, Washing-
ton, D.C., for Petitioners. Lawrence Lee Moise, III, VINYARD &

MOISE, P.C., Abingdon, Virginia, for Respondent Lockhart; J. Matthew McCracken, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent Director. **ON BRIEF:** Laura Metcoff Klaus, ARTER & HADDEN, Washington, D.C., for Petitioners. J. Davitt McAteer, Acting Solicitor of Labor, Donald S. Shire, Associate Solicitor for Black Lung Benefits, Christian P. Barber, Counsel for Appellate Litigation, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent Director.

_____

**OPINION**

MICHAEL, Circuit Judge:

Lane Hollow Coal Company and its insurer petition for review of an order of the Department of Labor's Benefits Review Board (BRB) in a case arising under the Black Lung Benefits Act (the Act).[1] This order affirmed the decision of an administrative law judge (ALJ), who had awarded black lung and survivor's benefits to Pauline Lockhart, the widow of former coal miner Woodrow Lockhart, and had directed that liability for these benefits should rest upon Lane Hollow as the "responsible operator."[2] In this appeal Lane Hollow challenges both of these determinations. While we agree with the BRB that substantial evidence supports the award of benefits, we believe that the extraordinary delay in notifying Lane Hollow of its potential liability deprived it of a meaningful opportunity to contest that liability. Accordingly, we affirm the award of benefits but vacate the designation of Lane Hollow as responsible operator.

I.

Woodrow Lockhart was born in 1917. He worked in the nation's

_____

[1] 30 U.S.C. §§ 901-945.

[2] Subject to qualifications not relevant here, the "responsible operator" is "the operator or other employer with which the miner has had the most recent periods of cumulative employment of not less than 1 year[.]" 20 C.F.R. § 725.493(a)(1).

coal mines for over twenty years. His last long-term employer, from 1972 to 1975, was petitioner Lane Hollow Coal Company.[3]

On June 10, 1975, Lockhart filed a claim for benefits under the Act. He listed several of his many former employers on a Department of Labor form submitted with his claim. The very first listed was Lane Hollow, along with a notation that he had worked there for about three years. The Department obtained Social Security records verifying this and a great deal of earlier coal mine employment. On November 18, 1976, a claims examiner denied benefits.

In 1977 Congress amended the Act to loosen eligibility criteria and directed that claims denied before or pending on March 1, 1978, could be reconsidered under the new standards if the claimant so elected. 30 U.S.C. § 945(a). Lockhart's claim was reconsidered, but it was denied on April 28, 1980, and (apparently after the submission of more evidence by Lockhart) denied yet again on June 24, 1981.

To this point, six years after the claim was filed, the Department of Labor had not attempted to notify a responsible operator. This first delay was no accident. Under its own regulations the Department may forego notifying the responsible operator in a Part 727 case[4] until and unless an initial finding of eligibility is made by a deputy commissioner, 20 C.F.R. § 725.412, or the claim is initially denied and the claimant requests a formal hearing. 20 C.F.R. § 725.410(d).

Whatever the wisdom or legality[5] of these regulations or the six-

_____

[3] Lane Hollow is defunct and its owner deceased. The Act requires a coal operator to obtain insurance against liability for benefits or to qualify to self-insure. 30 U.S.C. § 933. Like most small companies, Lane Hollow purchased insurance, and petitioner Old Republic Insurance Company is the carrier.

[4] 20 C.F.R. §§ 727.1-727.405, commonly referred to as the "interim regulations," were promulgated pursuant to the Black Lung Benefits Reform Act of 1977. In general, these regulations apply to reconsiderations of denied or pending claims under 30 U.S.C.§ 945(a) and to new claims filed between March 1, 1978, and March 31, 1980. See 20 C.F.R. §§ 718.1(b), 718.2, and 727.101-.200.

[5] The Fifth and Sixth Circuits have upheld the delayed notice against due process challenges, reasoning primarily that the approval rate of

3

year delay they engendered here, everything changed on July 15, 1981: Lockhart made a timely request for a hearing. Notwithstanding § 725.410(d), no responsible operator was named when the claim was transferred to the Office of Administrative Law Judges.

Five years passed. On August 12, 1986, the Department moved to remand the case so that a responsible operator could be named; three potential operators were named in this motion, including Lane Hollow. The ALJ granted the motion on October 3, 1986.

Five more years passed. On April 26, 1991, three potential responsible operators were notified, but not Lane Hollow. By happenstance, these operators were insured by petitioner Old Republic, so, as of April 26, 1991, Old Republic had both notice of the claim and the same incentive to defend it as it would have had on behalf of Lane Hollow.

Defense would prove difficult, however. Lockhart had been unable to outlive his claim -- he died of pneumonia December 12, 1989 -- and Old Republic would be left to build a medical opinion case from a hard record that could no longer be augmented.

One last snafu remained. The case had returned to the ALJ after the erroneous responsible operator designation. On March 3, 1992, the Department filed a second motion to remand so that Lane Hollow could be named. Lockhart's widow objected to this further delay, but the motion was granted on March 16, 1992. Lane Hollow was finally notified of the claim on April 6, 1992, seventeen years after notice could have been given and eleven years after the regulations command that it be given. Moreover, the Department reversed its many previous denials and found that Lockhart had been eligible for benefits beginning in October 1981. Lane Hollow contested this finding, and on August 12, 1993, the case was referred yet again to the ALJ.

_____

claims at the initial stage was so low that identifying and notifying operators sooner would not have been worthwhile. Peabody Coal Co. v. Holskey, 888 F.2d 440 (6th Cir. 1989); U.S. Pipe & Foundry Co. v. Webb, 595 F.2d 264 (5th Cir. 1979).

4

A hearing was held before the ALJ on February 2, 1994. The following August the ALJ issued a decision and order awarding benefits. He held that the weight of the x-ray evidence invoked the interim presumption of total disability due to pneumoconiosis as of October 1981 and that Lane Hollow had failed to rebut it. The BRB affirmed on July 26, 1995, and Lane Hollow has petitioned for review.

II.

A.

Lane Hollow first argues that the ALJ violated the Administrative Procedure Act (APA) by failing to adequately explain the reasons for his conclusions. The APA requires an ALJ's opinion to contain his "findings and conclusions, and the reasons or bases therefor, on all material issues of fact, law or discretion presented on the record." 5 U.S.C. § 557(c)(3)(A). We must affirm the award of benefits if it is in accordance with law and is supported by substantial evidence. Wilson v. Benefits Review Board, 748 F.2d 198, 199-200 (4th Cir. 1984).

B.

Because Lockhart's claim was filed before the effective date of the permanent regulations at 20 C.F.R. Part 718, and he worked for over ten years in the mines, he was eligible for the interim presumption of entitlement under the criteria of 20 C.F.R. § 727.203(a). As the "proponent of [the] rule or order," the claimant has the burden of proving entitlement to the interim presumption. 5 U.S.C.§ 556(d); Director, OWCP v. Greenwich Collieries, 512 U.S. 267 (1994). Similarly, once the presumption is invoked, the proponent of any rebuttal bears the burden.

The interim presumption is invoked if "[a] chest roentgenogram (X-ray) . . . establishes the existence of pneumoconiosis[.]" § 727.203(a)(1). Notwithstanding this provision's reference to a singular x-ray, it in fact requires the ALJ to weigh all available x-ray evidence to determine whether it preponderates in favor of a finding of pneumoconiosis. Mullins Coal Co. v. Director, OWCP, 484 U.S. 135 (1987).

5

Lockhart had single x-rays taken in 1974, 1975, 1977, 1980, 1981, and 1985, and three during the last thirty days of his life. These last three were of such poor quality as to be unreadable; hence, they are evidence of nothing and were disregarded by the ALJ.

There were nine readings of the 1974-1980 x-rays. Without elaboration on the point, the ALJ held that the weight of this evidence was against the existence of pneumoconiosis. The 1981 and 1985 x-rays were another story. All six readings in the record were positive. Thus, the ALJ found that the interim presumption was invoked as of the date of the 1981 x-ray.

The basic purpose of the APA's duty of explanation is to help the ALJ get it right -- the exercise of writing is a great catalyst to rational thought -- but its secondary purpose is to allow us to discharge our own duty to review the decision. See v. Washington Metropolitan Area Transit Authority, 36 F.3d 375, 384 (4th Cir. 1994). If we understand what the ALJ did and why he did it, we, and the APA, are satisfied. An adequate explanation can be a succinct one; the APA neither burdens ALJs with a duty of long-windedness nor requires them to assume that we cannot grasp the obvious connotations of everyday language. Brevity can foster clarity.

Lane Hollow asserts that the ALJ did not explain how he weighed the x-ray evidence. The faulty premise of Lane Hollow's argument is that the ALJ credited the 1981-1985 x-ray evidence over the earlier readings. He did not. The weight of the 1974-1980 x-ray evidence was negative, and the ALJ so held: no benefits were awarded for this period. All of the 1981-1985 x-ray evidence was positive, and the ALJ so held, awarding benefits as of the earliest of the films. Because pneumoconiosis is progressive and irreversible, these holdings presented no chronological anomaly requiring further inquiry.**6** In sum, the

_____

**6** The relative sequence of medical tests can fully explain why credible results may differ or reveal that some of the results are not credible. In the latter case, the ALJ must resort to something other than chronology. We discussed this principle in Adkins v. Director, OWCP, 958 F.2d 49, 51-52 (4th Cir. 1992):

> In a nutshell, the ["later is better"] theory is:
> (1) pneumoconiosis is a progressive disease; (2)  therefore,

6

ALJ's reasoning is obvious, his brevity in no manner hampers our review, and his finding that the x-ray evidence established the existence of pneumoconiosis as of October 1981 is supported by substantial evidence.

C.

The interim presumption is rebuttable in any of four ways, § 727(b)(1)-(4), but Lane Hollow's options here were more limited. Because the existence of pneumoconiosis had been proved by a preponderance of the evidence under § (a)(1) at the presumption invocation stage, § (b)(4), which requires the opposite proof, could not apply. See Mullins Coal, 484 U.S. at 149-150 & nn. 24, 26.[7] Subsections (b)(1) and (b)(2) were unavailable because there was no evi-

_____

claimants cannot get better; (3) therefore, a later test or exam is a more reliable indicator of the miner's condition than an earlier one.

This logic only holds where the evidence is consistent with premises (1) and (2) -- i.e., the evidence, on its face, shows that the miner's condition has worsened. In that situation, it is possible to reconcile the pieces of proof. All may be reliable; they do not necessarily conflict, though they reach different conclusions. All other considerations aside, the later evidence is more likely to show the miner's current condition.

On the other hand, if the evidence, taken at face value, shows that the miner has improved, the "reasoning" cannot apply. It is impossible to reconcile the evidence. Either the earlier or later result must be wrong, and it is just as likely that the later evidence is faulty as the earlier. The reliability of irreconcilable items of evidence must therefore be evaluated without reference to their chronological relationship.

[7] We recognize that there is some debate over whether the Supreme Court's observations in Mullins Coal were of law or of practical fact and, if the latter, whether there may be some extraordinarily unusual case in which (b)(4) rebuttal might defeat the (a)(1) presumption. To this point, the debate has been academic, because no such case has presented itself. See Curry v. Beatrice Pocahontas Coal Co., 67 F.3d 517, 522-524 & n.9 (4th Cir. 1995). The debate may remain academic forever. There can be no new claims involving the interim presumption, and the pool of pending claims will inevitably, if ever-so-slowly, dwindle away.

dence that Lockhart worked after the date the presumption was invoked or was able from a whole-man standpoint **8** to do so.

Subsection (b)(3) was the only choice open to Lane Hollow. Rebutting the presumption under this provision is not easy. The operator must show that "the total disability or death of the miner did not arise in whole or in part out of coal mine employment." 20 C.F.R. § 727.203(b)(3) (emphasis added). Because of the "in part" language, "the employer must rule out the causal connection between the miner's total disability and his coal mine employment[.]" Bethlehem Mines Corp. v. Massey, 736 F.2d 120, 123 (4th Cir. 1984). This hurdle is a high one, and deliberately so.

> The reality of coal mine employment is such that many physical and environmental factors may converge to produce a totally disabling respiratory or pulmonary impairment. The Secretary's rebuttal regulation [i.e., (b)(3)] acknowledges this reality and, consistent with the letter and spirit of the Black Lung Act and traditional workers' compensation principles, places the burden on the employer to disprove the causal relationship between coal mine employment and total disability once the claimant establishes the existence of a qualifying medical condition. In cases in which the combined effects of several diseases disable the miner, the employer obviously cannot meet its burden of proof by focusing solely on the disabling potential of the miner's pneumoconiosis. Its proof offering under section [(b)(3)] in such cases must establish that the miner's primary condition, whether it be emphysema or some other pulmonary disease, was not aggravated to the point of total disability by prolonged exposure to coal dust.

Id. at 124.

Disputing the clinical accuracy of the law is not rebuttal. Thorn v. Itmann Coal Co., 3 F.3d 713, 719 (4th Cir. 1993). For example, a

_____

**8 See Sykes v. Director, OWCP**, 812 F.2d 890, 893-894 (4th Cir. 1987) (subsection (b)(2) contains no causation element; rebuttal thereunder is thus unavailable if the miner is disabled for any reason).

8

physician may opine that a given miner has no pulmonary impairment attributable to coal mine employment because simple pneumoconiosis does not generally cause any pulmonary impairment. The interim regulations presume precisely the opposite, and the presumption must be rebutted with proof rather than disagreement.

What constitutes such proof? Usually it takes one of two forms: a causal connection can be "ruled out" if positive evidence demonstrates that the miner suffers from no respiratory or pulmonary impairment of any kind, Grigg v. Director, OWCP , 28 F.3d 416, 419 (4th Cir. 1994), or if such evidence explains all of any impairment present and attributes it solely to sources other than coal mine employment. Cf. Dehue Coal Co. v. Ballard, 65 F.3d 1189 (4th Cir. 1995) (pneumonectomy occasioned by smoking-induced lung cancer was self-sufficient cause of total disability (applying permanent regulations)).

Here, the three physicians relied on by Lane Hollow did not examine (and, of course, could not have examined) Mr. Lockhart.[9] As a consequence, they were greatly hampered in stating an opinion strong enough to satisfy Massey without resorting to the sort of philosophical disagreement with the interim presumption forbidden as rebuttal by Thorn.

These physicians reviewed parts of the medical record, but they missed, most notably, the unanimously positive x-ray readings from 1981 and 1985. Dr. Gregory Fino concluded that (i) "[t]here is no evidence of coal workers' pneumoconiosis"; (ii) "there is no objective evidence of any respiratory impairment"; and (iii) "[t]herefore, there is no respiratory disability." Dr. William Anderson found that "[t]here is nothing in this record to indicate that he had any impairment which had arisen from his coal mine employment and his death

_____

[9] The claimant did have favorable medical opinion evidence from an examining physician. Dr. Emory Robinette examined Mr. Lockhart on September 13, 1985. He diagnosed simple pneumoconiosis with perfusion 2/1 and size q opacities. He noted "obvious respiratory disease" due to pneumoconiosis; while the exact degree of impairment was difficult for him to assess, Dr. Robinette opined that it was sufficient to render Lockhart "unemployable."

9

was not in any way related to coal workers pneumoconiosis. Even if we assume he had simple coal workers pneumoconiosis there would be no relationship." Dr. Emery Lane concluded,

> There is a paucity of data concerning pulmonary function. Arterial blood gases reveal only mild hypoxemia during a hospitalization but he apparently had congestive heart failure and pneumonia. Thus, he probably did not have very significant pulmonary impairment underlying these problems. There is no evidence of an impairment arising from coal mine employment (inhalation of coal mine dust).

These opinions fall well short of Massey's high standard. As Thorn and Grigg emphasize, there is a critical difference between evidence of no impairment, which can, if credited, rebut the interim presumption, and no evidence of impairment, which cannot. At their very strongest, the opinions of Lane Hollow's physicians establish only that those physicians would not presume what the (a)(1) interim presumption presumes, i.e., that a person suffering from simple pneumoconiosis who has worked for ten or more years in the mines (i) acquired the disease there and (ii) is totally disabled by it.[10]

The ALJ was quite correct, then, when he rejected Lane Hollow's proffered rebuttal on the ground that "lack of evidence in the record cannot carry Employer's burden of proof." The decision of the ALJ was rational, adequately explained, and supported by substantial evidence. Accordingly, the award of benefits is affirmed.

III.

Lane Hollow argues that the extraordinary delay in notifying it of its potential liability on Lockhart's claim deprived it of a meaningful

_____

[10] In addition, only one of the physicians for Lane Hollow, Dr. Anderson, stated any opinion that assumed the presence of pneumoconiosis, and that opinion seems to address only the relationship between the disease and Mr. Lockhart's death. Where the interim presumption is invoked under (a)(1), medical opinions that assume that pneumoconiosis is not present cannot clear Massey's high hurdle. Grigg, 28 F.3d at 419-420.

10

opportunity to defend itself in violation of the Due Process Clause of the Fifth Amendment. If Lane Hollow is correct, Mrs. Lockhart's award of benefits will be unaffected; instead, liability for those benefits will be borne by the Black Lung Disability Trust Fund.**11** The Director concedes, as he must, that the claim was handled inefficiently. Nevertheless, the Director maintains that Lane Hollow neither raised this issue below nor suffered any unfair prejudice from the delay.

A.

At the outset, we must address the Director's assertion that Lane Hollow waived its due process argument by not adequately presenting it below.

"[W]aiver is a nonjurisdictional doctrine that calls for flexible application." Toler v. Eastern Associated Coal Co., 43 F.3d 109, 113 (4th Cir. 1995); see also Rana v. United States , 812 F.2d 887, 889 n.2 (4th Cir. 1987). While we of course look to the manner in which the issue was or might have been raised below, our primary inquiry is whether and how our review of the issue might do violence to the agency's role. We should consider whether the issue is one upon which the agency has special expertise, Rana, 812 F.2d at 890, and whether it is just under the circumstances for us to dispense with exhaustion of administrative remedies, bearing in mind that we should never do so lightly.

> Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.

United States v. L. A. Tucker Truck Lines, Inc. , 344 U.S. 33, 37 (1952).

_____

**11** The Trust Fund must pay benefits when "there is no operator who is liable" for them. 26 U.S.C. § 2501(d)(1)(B).

11

Here, it is easy for us to conclude that Lane Hollow did not waive its due process argument. Though it certainly did not press the matter as ardently and cogently as it has in this court, Lane Hollow's due process challenge drew the attention of the BRB and was rejected on the merits.[12] On similar facts, we concluded in Thorn that, "with the BRB's full consideration of the issue, the policy reasons behind administrative waiver . . . are simply not present." 3 F.3d at 717.

B.

"Due process" is a versatile term designed for the daunting task of assuring justice to anyone from whom the state, or someone using the machinery of the state, wishes to take life, liberty, or property.[13] We cannot imagine a better or more succinct choice of words than the one the Framers made. "Justice" and "fundamental fairness" are often urged to us as rough synonyms, but they actually describe just the end; "due process" is the means.

What do these two simple words command? First, there must be a process of some kind; a just result is not enough. Carey v. Piphus, 435 U.S. 247, 266 (1978) ("[T]he right to procedural due process is `absolute' in the sense that it does not depend on the merits of a claimant's substantive assertions[.]"); Coe v. Armour Fertilizer Works, 237 U.S. 413, 424 (1915). The work of mobs and vigilantes is swift and the result might sometimes be deserved. But the risk of error (as well as the insult to orderly society) inherent in such self-help was more than the Framers would tolerate. We can prevent erroneous deprivations from some only by providing a process to all.

_____

[12] The BRB stated:

> To the extent that employer is arguing that the delay in processing the claim and in notifying it of its potential liability constitutes a violation of its due process rights, we hold that any prejudice it may have suffered from the delay does not rise to the level of constitutional magnitude.

Lockhart v. Lane Hollow Coal Co., BRB No. 94-3953 BLA, at 3 n.2 (Benefits Review Board July 26, 1995) (quotations omitted).

[13] The requirement of due process is fully applicable to adjudicative proceedings conducted by administrative agencies. Richardson v. Perales, 402 U.S. 389, 401 (1971).

12

Second, the process must be at least what is "due," i.e., it must be adequate to the task at hand. The past half-century of jurisprudence, combined with a commendable response to it from all levels and types of government, has made rare the case where there is not an adequate procedure on the books to handle a given deprivation. Most modern cases are like this one, involving a real or alleged breakdown of a prescribed process that, if followed reasonably well, would provide far more than the constitutional minimum.

No "process," however thorough, can provide what is "due" without notice to those who stand to lose out thereby. Tazco v. Director, OWCP, 895 F.2d 949, 950 (4th Cir. 1990). "[The] right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). It is not always sufficient that the notice be received at some point before the deprivation; instead, the notice "must afford a reasonable time for those interested to make their appearance." Id. (emphasis added). A "reasonable time" is "a time when the deprivation can still be prevented." Fuentes v. Shevin, 407 U.S. 67, 81 (1972).[14] According to Lane Hollow, the notice it received did not afford a reasonable time for it to appear and interpose a defense.

The Director points out that several cases have upheld the liability of a responsible operator that was not notified of the claim until after the miner's death. E.g., Director, OWCP v. Oglebay Norton Co., 877 F.2d 1300 (6th Cir. 1989). We do not quarrel with that narrow proposition. The Due Process Clause does not require the government to

_____

[14] See, e.g., Armstrong v. Manzo, 380 U.S. 545 (1965) (natural father's ability to move to set aside adoption decree of which he had no prior notice, and to receive a full hearing on the motion, was inadequate to satisfy due process); Roller v. Holly, 176 U.S. 398 (1900) (1890 notice to Virginia resident, directing him to appear and defend a suit in Texas five days later, was insufficient); In re American Medical Systems, Inc., 75 F.3d 1069, 1086 (6th Cir. 1996) (where hearing on class certification had already taken place, new defendant named in amended complaint was denied due process by class certification issued three days after service of the amended complaint).

13

insure the lives of black lung claimants. The problem here is not so much that Lockhart died <u>before</u> notice to Lane Hollow, but rather that he died many years <u>after</u> such notice could and should have been given. The government's grossly inefficient handling of the matter -- and not the random timing of death -- denied Lane Hollow the opportunity to examine Lockhart.

Our analysis of the merits of Lockhart's claim in part II above shows how the delay precluded Lane Hollow from attempting to mount a defense. The record was simply not developed in a manner to either demonstrate or disprove respiratory impairment or to define an etiology of any impairment. Lockhart had the luxury, if it could be called that, of proving his whole claim with positive x-rays.**15**

Of course, it is possible that, had they been able to examine Lockhart, Lane Hollow's physicians would nonetheless have been unable to "rule out" a connection between pneumoconiosis and Lockhart's disability. It may even be likely that they could not; we cannot know. Thus, it <u>may</u> be that Lane Hollow suffered no actual harm from the much-belated notice. Can this possibility excuse the delay? We think not; to excuse the delay would, in a Catch-22 fashion, rely upon Lane Hollow's inability to garner evidence in defense to justify denying it the opportunity to do so.

Moreover, speculation about the would-have-been and could-have-been misconstrues the focus of our inquiry. In this core due process context, we require a showing that the notice was received too late to provide a fair opportunity to mount a meaningful defense; we do not require a showing of "actual prejudice" in the sense that there is a reasonable likelihood that the result of this claim would have been different absent the violation. The Due Process Clause does not create a right to <u>win</u> litigation; it creates a right <u>not to lose</u> without a fair opportunity to defend oneself.

_____

**15** Dr. Robinette's report also supported the claim, but, because Lockhart was unable to complete pulmonary function tests, Dr. Robinette relied heavily on his own examination and assessment of the miner to conclude that he had impairment attributable to pneumoconiosis. Lane Hollow's physicians had no such opportunity.

14

To be sure, there are "due process" cases in which we require a showing that the error complained of actually prejudiced the result on the merits, but these cases are of a much different ilk.

"Due process" is a big tent. It covers not merely the procedural fundamentals at issue here but also certain substantive personal liberties[16] and basic rules of justice. In the criminal law context, these two simple words are the repository of an array of rules requiring fair play from the government. If a prosecutor makes an inflammatory closing argument, suppresses exculpatory evidence, or delays indictment to gain a tactical advantage, "due process" protects the accused. <u>See</u> <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637 (1974); <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); <u>United States v. Gouveia</u>, 467 U.S. 180 (1984). However, in their essential character, these fair-play rules do not resemble the core components of due process, i.e., notice and the right to a hearing appropriate to the proposed deprivation at a meaningful time and place; instead, they are simply rules (albeit fundamental ones) of criminal law and practice. While transgressions of these rules <u>implicate</u> due process, they do not <u>violate</u> it unless they render the trial unfair. <u>Donnelly</u>, 416 U.S. at 643. Consequently, we can and do assess the impact of such errors upon the fairness of the trial and its reliability as an accurate indicator of guilt. <u>See</u>, <u>e.g.</u>, <u>Jones v. Angelone</u>, 94 F.3d 900, 904-911 (4th Cir. 1996). If the defendant has had a fair day in court and heard a reliable verdict, he has received all that due process guarantees him.

Core violations of due process are of another order. If there has been no fair day in court, the reliability of the result is irrelevant, because a fair day in court is how we assure the reliability of results. Inasmuch as Lane Hollow did not receive notice of the claim "when the deprivation [could] still be prevented," <u>Fuentes</u>, 407 U.S. at 81, we may not speculate that it could not have been prevented.

> To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merits.

---

[16] <u>E.g.</u>, <u>Loving v. Virginia</u>, 388 U.S. 1 (1967); <u>Griswold v. Connecticut</u>, 381 U.S. 479 (1965).

15

Coe, 237 U.S. at 424.

The inexcusable delay in notifying Lane Hollow deprived it of the opportunity to mount a meaningful defense to the proposed deprivation of its property; consequently, it was denied due process of law.

Because Lane Hollow cannot lawfully be deemed the"responsible operator," there is not one. Accordingly, payment of Mrs. Lockhart's benefits must be made from the Black Lung Disability Trust Fund. The award of benefits is affirmed, and the designation of Lane Hollow as responsible operator is vacated.

AFFIRMED IN PART AND VACATED IN PART

16